Rehearing en banc granted, January 4, 2011

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FREDERICK P. HENRY,

*Plaintiff-Appellant,*

v.

ROBERT PURNELL,

*Defendant-Appellee.*

No. 08-7433

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:04-cv-00979-JFM)

Argued: March 23, 2010

Decided: September 24, 2010

Before GREGORY and AGEE, Circuit Judges, and
Eugene E. SILER, Jr., Senior Circuit Judge of the
United States Court of Appeals for the Sixth Circuit,
sitting by designation.

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Agee wrote the majority opinion, in which Senior Judge Siler joined. Judge Gregory wrote a dissenting opinion.

## COUNSEL

**ARGUED**: Katherine Louise Bushman, GEORGETOWN UNIVERSITY LAW CENTER, Appellate Litigation Pro-

gram, Washington, D.C., for Appellant. John Francis Breads, Jr., Hanover, Maryland, for Appellee. **ON BRIEF:** Steven H. Goldblatt, Director, Charlotte J. Garden, Supervising Attorney, May K. Chiang, Student Counsel, Kate G. Henningsen, Student Counsel, GEORGETOWN UNIVERSITY LAW CENTER, Appellate Litigation Program, Washington, D.C., for Appellant.

---

**OPINION**

AGEE, Circuit Judge:

Robert Purnell, a deputy sheriff in Somerset County, Maryland, attempted to execute a warrant for Frederick Henry's arrest. Henry fled on foot and Deputy Purnell gave chase, mistakenly drawing his firearm, instead of his taser, and shooting Henry in the elbow. As a result of this incident, Henry filed a § 1983 suit against Deputy Purnell in the United States District Court for the District of Maryland, asserting that Purnell used excessive force in effecting his arrest. The district court ultimately concluded that Deputy Purnell's mistake was reasonable and granted his motion for summary judgment. For the following reasons, we affirm in part and reverse in part the judgment of the district court, and remand with instructions.

I.

We begin by summarizing the factual background, viewed in the light most favorable to Henry, as this is the appropriate standard in reviewing the facts upon an award of summary judgment. *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009). In 2003, the Circuit Court for Somerset County, Maryland ordered Henry either to pay child support or report to jail on a specified date. When Henry failed to comply with the court's order, the Somerset County

state's attorney charged him with second degree escape and obtained a warrant for his arrest.[1] Deputy Purnell was tasked with executing Henry's arrest warrant.

Purnell went to Henry's last known address and encountered an unidentified male sitting on the steps of a nearby trailer. The unidentified male indicated that he was a friend of the family who was helping to mow the grass and that Henry was not present. The man explained to Deputy Purnell that Henry lived "somewhere on Hampton Avenue in Princess Anne" and that he was working in Ocean City for a company called American Paving. Joint Appendix ("J.A.") at 220.

Purnell asked the man to tell Henry that there was an outstanding warrant for his arrest and that if Henry would contact him, he "would try to help him out." *Id.* at 221. Purnell also wrote his name and telephone number on a piece of paper, which he asked the man to give to Henry. The unidentified male stated that he would give the paper to Henry's wife, who was inside the trailer. The man entered the trailer and then returned, stating that he had given the note to Henry's wife. Although Deputy Purnell suspected the man was Henry, he thanked the man and left.

Deputy Purnell subsequently drove to the local office of American Paving to inquire about Henry's employment. He was informed that Henry no longer worked for American Paving, but that the company's business records contained a personnel photograph. From this photograph, Purnell was able to determine that the unidentified male at the trailer was, in fact, Henry.

---

[1]Under Maryland law, an individual who "knowingly fail[s] to obey a court order to report to a place of confinement" is guilty of second degree escape. MD. Code Ann., Crim. Law, § 9-405(a)(2) (West 2003). A person guilty of the "misdemeanor of escape in the second degree . . . is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both." *Id.* § 9-405(b).

Upon returning to Henry's residence, Deputy Purnell knocked on the trailer door and spoke to Henry's wife. Mrs. Henry had not received the note Purnell had left earlier that day, but she allowed him to enter the home to search for Mr. Henry, who was not present. She also informed Deputy Purnell that her husband's employer drove a white truck and lived in Princess Anne, Maryland. The following day Purnell received a phone message from Mrs. Henry indicating that she had given Mr. Henry his message and that Mr. Henry had traveled to Baltimore to raise money for bail.

Several days later, on October 23, 2003, Deputy Purnell was parked in his patrol car when he observed a white truck with three male occupants heading in the direction of Henry's trailer. As the truck passed, the man seated next to the truck's passenger window turned his head away from Deputy Purnell. His suspicions aroused, Purnell drove to Henry's residence and found the white truck parked in the driveway.

Deputy Purnell parked his patrol car behind the truck, exited his vehicle, and determined that all three men were still in the truck. He approached the driver's side of the vehicle and asked each man if he was Frederick Henry. Each man initially said no. When Purnell asked the same question a second time, however, Henry admitted his identity. At this point, Henry exited the truck and moved along with Deputy Purnell to the rear of the truck. Henry then ran in the direction of his residence with Purnell giving chase. While running in pursuit of Henry and keeping his eye on "the target," *i.e.*, Henry, Deputy Purnell drew what he believed was his taser. *Id.* at 269. After three to five seconds, Purnell discharged what was, in fact, his firearm, striking Henry in the elbow.[2]

Only when Purnell heard the distinctive "pop" of the firearm did he realized his mistake. *Id.* at 272. Deputy Purnell

---

[2]It is undisputed that the entire flight, chase, and shooting spanned no more than ten seconds.

told Henry that he "was sorry" for the shooting and that he had "pulled the wrong weapon." *Id.* at 273. He also contacted the dispatcher to obtain medical assistance for Henry and allowed one of Henry's companions to retrieve ice and a towel from Henry's residence. Once another officer arrived on the scene, Deputy Purnell took a pressure bandage from his vehicle and applied it to Henry's arm. An ambulance subsequently transported Henry for medical treatment.

## II.

We now turn to this case's lengthy procedural history. Henry filed suit under 42 U.S.C. § 1983 in the United States District Court for the District of Maryland on March 24, 2004, alleging that Purnell violated his Fourth Amendment right to be free from seizures effectuated by excessive force. In response, Deputy Purnell filed a motion requesting that the district court dismiss Henry's complaint or grant summary judgment in his favor. Purnell argued that he had not "seized" Henry and, in the alternative, that he was entitled to qualified immunity. After concluding that disputed issues of material fact did not permit judgment as a matter of law, the district court denied Purnell's motion.

Upon appeal to this Court, Purnell argued the record did not support the district court's conclusion that a factual dispute precluded it from granting judgment as a matter of law and that he was entitled to qualified immunity. Because we lacked jurisdiction to entertain an interlocutory appeal on qualified immunity based on "the district court's factual findings," we dismissed the appeal. *Henry v. Purnell*, 119 Fed. Appx. 441, 443 (4th Cir. 2005) (unpublished).

Henry subsequently was granted permission from the district court to amend his complaint to add a claim for excessive force predicated on the Maryland Constitution's Declaration of Rights. The parties also engaged in discovery and entered into an evidentiary stipulation that Deputy Purnell "intended

to unholster and discharge his Taser M26 which was mounted in a thigh holster below his service weapon, a Glock .40 caliber handgun. Instead, he unholstered and fired his service weapon, believing that it was his Taser M26." J.A. at 30.

Thereafter, Deputy Purnell filed a second motion for summary judgment in which he argued that Henry had not been "seized" and that the parties' stipulation that the shooting was an unintentional mistake disposed of Henry's Fourth Amendment claim. Henry opposed the motion on three grounds, positing that the shooting did constitute a seizure, that outstanding issues of material fact required resolution by a jury, and that Purnell was not entitled to qualified immunity.[3] Henry also requested the district court compel Purnell to disclose information relating to his taser and firearm training and departmental policy regarding the use of force. Based on its conclusions that (1) Deputy Purnell had "seized" Henry within the meaning of the Fourth Amendment and (2) several outstanding factual issues precluded an award of qualified immunity, the district court denied Purnell's motion for summary judgment and granted Henry's motion to compel. *See Henry v. Purnell*, 428 F. Supp. 2d 393, 395-98 (D. Md. 2006).

Purnell appealed the district court's order and contended that the court erred in concluding that he "seized" Henry and in failing to accord him qualified immunity. We affirmed the district court's determination that Purnell's shooting of Henry resulted in a Fourth Amendment "seizure." *Henry v. Purnell*, 501 F.3d 374, 381-82 (4th Cir. 2007). But we questioned whether the district court applied the appropriate burden of

---

[3]In his response to Deputy Purnell's second motion for summary judgment, Henry argued that several outstanding factual issues bore on the question of whether Purnell's mistaken use of his firearm was reasonable, including (1) the omission of a verbal warning before Purnell fired, (2) the lack of a thumb safety device found on the taser but not on the firearm, and (3) the failure to utilize the visible laser sight emitted once the taser's safety mechanism was disengaged.

proof at the dual stages of the qualified immunity analysis.[4] *See id.* at 383-84. Accordingly, we remanded the case for the district court to "reassess the issue of whether a constitutional violation occurred in light of the proper burden of proof and the discovery materials that it ordered Purnell to produce." *Id.* at 384. If Henry succeeded in "establishing that the seizure in this case was unreasonable (*i.e.*, that Purnell's mistake in using the Glock rather than the [t]aser was unreasonable)," we indicated that Purnell would "have the opportunity to demonstrate his entitlement to qualified immunity." *Id.*

On remand, Henry received the requested discovery relating to Purnell's weapons training and the use of force policy. Deputy Purnell then filed his third motion for summary judgment, which emphasized that he had "no field training with, or field use of, the [t]aser prior to the occurrence." J.A. at 115. With this factor in mind, Purnell maintained that his mistaken use of the firearm was reasonable, particularly as the holsters issued by the sheriff's department placed both the firearm and the taser on the right side of his body.[5]

Henry opposed the motion by arguing that material facts remained in dispute and that he had successfully established a violation of the Fourth Amendment. On the merits, Henry claimed that Deputy Purnell's mistake was unreasonable because he did not "comply with multiple police department regulations," resulting in a "reckless failure to take steps to avoid the impermissible use of excessive force." J.A. at 520-21. Qualified immunity, in Henry's view, was also improper because it was clearly established that "reckless conduct on

---

[4]We clarified that the plaintiff bears the burden of proof on the question of whether the defendant's conduct violated a constitutional right, while the defendant bears the burden of proof on the question of whether that right was clearly established at the time of the event. *See Henry*, 501 F.3d at 377-78.

[5]The holsters issued to Deputy Purnell placed the firearm on his right hip and the taser on his right thigh.

the part of a police officer that directly leads to an accidental or unintentional shooting violates the suspect's Fourth Amendment rights." *Id.* at 526. In any case, Henry maintained that his state-law claim should survive a summary judgment motion because statutory immunity under Maryland law would apply only if a jury determined that Purnell's conduct was not "grossly negligent and/or reckless." *Id.* at 529.

The district court agreed with Purnell on the issue of reasonableness and granted his motion for summary judgment. *See Henry v. Purnell*, 559 F. Supp. 2d 648, 653 (D. Md. 2008). In reaching that conclusion, the district court framed its analysis based on its understanding of the remand order from this Court:

> It is apparent from the opinion in *Purnell II* that even when, in the Fourth Circuit's view, the underlying facts of the Henry/Purnell incident, viewed most favorably to Henry, do not themselves give rise to an inference that Purnell's use of his Glock was unreasonable. Otherwise, the court would have ruled (as did I) that regardless of additional facts that might be learned from discovery on the training issues, genuine issues of material fact existed as to the reasonableness question. Therefore, I will focus my analysis here upon whether any of the facts (and reasonable inferences therefrom) that have been established during the course of the additional discovery would give rise to a finding of unreasonableness.

*Id.* at 652.

The court answered this last query in the negative after its review of the additional discovery materials indicated "the training that Purnell received concerning the use of a [t]aser was quite minimal." *Id.* In ruling in Deputy Purnell's favor, the district court rejected Henry's assertion that there were factual issues related to Purnell's failure to comply with his

training, which precluded the court from granting judgment as a matter of law. The court indicated, for example, that it was "not reasonably inferable from the record that Henry would have complied with" a verbal warning or command to stop or be tased. *Id.* at 652 n.3. It also dismissed as "speculative" Henry's claim that had the visible laser sight been used, a reasonable officer would have known that he had drawn his gun and not his taser. *Id.* Furthermore, the court deemed reasonable Deputy Purnell's failure to note the lack of a thumb safety mechanism on his Glock, but present on his taser, because Purnell had developed an "instinctive thumb motion" while previously using a handgun that incorporated a similar device. *Id.*

Because Maryland courts construe Article 26 of the Maryland Declaration of Rights "*in pari materia* with the Fourth Amendment," *Jones v. State*, 962 A.2d 393, 400 n.2 (Md. 2008), the district court's determination that Henry failed to establish a Fourth Amendment violation disposed of both his federal and state law claims. The district court, therefore, did not consider whether Deputy Purnell was entitled to immunity under federal or state law. *See Henry*, 559 F. Supp. 2d at 649 n.1.

Henry timely appealed the district court's judgment and we have jurisdiction under 28 U.S.C. § 1291.

III.

Whether a party is entitled to summary judgment is a question of law we review de novo using the same standard applied by the district court. *See Canal Ins. Co. v. Distribution Servs., Inc.*, 320 F.3d 488, 491 (4th Cir. 2003); *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002). Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, "no material facts are disputed and the moving party is entitled to judgment as a matter of law."

*Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003). Under this standard, courts in qualified immunity cases usually adopt "the plaintiff's version of the facts." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quotation omitted).

IV.

What is now before us is Henry's challenge to the district court's order granting summary judgment in favor of Deputy Purnell. Henry contends that the district court erred on two grounds. First, he contends the district court erred in its Fourth Amendment analysis by focusing only on the evidence related to Deputy Purnell's training, rather than on the totality of the circumstances. *See* Opening Brief at 17. Second, Henry maintains the district court erred in resolving disputed factual issues in favor of Purnell and in failing to view the facts and related inferences in the light most favorable to him. *See id.* at 38-40.

Henry recognizes, however, that even if summary judgment should not have been granted on his Fourth Amendment claim, Purnell may still claim entitlement to qualified immunity. Consequently, he also argues that Deputy Purnell violated clearly established law in using "deadly force against a fleeing, unarmed, and non-dangerous suspect." *Id.* at 42. And even if qualified immunity invalidates his federal claim, Henry posits that his state law claim should survive summary judgment because "[w]hether an officer's actions are grossly negligent, and therefore unprotected by statutory immunity, is generally" a question reserved for the jury. *Id.* at 47.

Deputy Purnell responds that the short time period in which he had to act and his unfamiliarity with the gun and taser rendered his mistaken use of the firearm objectively reasonable. *See* Response Brief at 19. Arguing that our prior decision in this case "was the first to hold that the Fourth Amendment was even implicated in the event of a mistaken application of deadly force through weapon confusion," Purnell further

asserts his entitlement to qualified immunity. *Id.* at 20. He also seeks the protection of state statutory immunity based on the absence of "evidence in [the] record of gross negligence." *Id.*

We consider these arguments in turn.

A.

The Fourth Amendment's prohibition on unreasonable searches and seizures encompasses the right to be free of "seizures effectuated by excessive force." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). Whether a degree of force is reasonable is measured "by a standard of objective reasonableness." *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). Courts accordingly inquire "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). With this foundation in mind, we first consider Henry's argument that the district court erred in focusing its Fourth Amendment analysis on the additional discovery related to Deputy Purnell's weapons training.

Properly applying the test of objective reasonableness requires courts to give "careful attention to the facts and circumstances of each particular case." *Id.* at 396. The reasonableness of an officer's use of force is a fact-bound question, which turns on the "totality of the circumstances." *Young v. Prince George's County*, 355 F.3d 751, 757 (4th Cir. 2004). Determining "what a 'reasonable officer on the scene' would have done" thus depends on a careful weighing of all of the relevant facts. *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (quoting *Graham*, 490 U.S. at 396). In other words, courts determining whether an application of force is objectively reasonable must consider "'the totality of the circumstances,'" which includes (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the officer or others, and (3) whether the suspect was

attempting to resist or evade arrest. *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). With all of the relevant circumstances before it, a court may then properly balance an individual's Fourth Amendment interests and the Government's countervailing law enforcement concerns. *See id.*

Here, the district court "focus[ed]" its Fourth Amendment analysis on whether "any of the facts . . . established during the course of the additional discovery [gave] rise to a finding of unreasonableness." *Henry*, 559 F. Supp. 2d at 652. In confining its Fourth Amendment analysis to this limited factual basis, we conclude the district court erred.

Our prior opinion remanded this case to afford Henry "the opportunity to present all potentially relevant evidence" before the district court decided whether he "met his burden of establishing that [his] seizure . . . was unreasonable." *Henry*, 501 F.3d at 384. Apart from our conclusion that Deputy Purnell "seized" Henry within the meaning of the Fourth Amendment, we rendered "no opinion on the ultimate merits of the case" and did not circumscribe the full range of evidence which a review of the totality of the circumstances would require. *Id.* The district court, therefore, should not have assumed that "the underlying facts of the Henry/Purnell incident" were less relevant to its determination of the reasonableness of Purnell's mistaken use of the firearm than "the additional discovery" related to Purnell's weapons training. *Henry*, 559 F. Supp. 2d at 652.

The district court thus erred in limiting the scope of its Fourth Amendment reasonableness analysis to the adequacy of Deputy Purnell's weapons training, instead of examining the totality of the circumstances.

### B.

Notwithstanding the district court's error as to the totality-of-the-circumstances standard used in evaluating the objective

reasonableness of an officer's conduct, the judgment may still be affirmed if qualified immunity applies. The essential question thus becomes whether Purnell is entitled to qualified immunity, a doctrine which shields government actors from liability if they establish either that (1) the plaintiff's allegations fail to make out a violation of a constitutional right, or (2) the right at issue was not clearly established at the time of the alleged misconduct. *See Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009). In this case, Henry's federal and state law claims would both be invalidated if, as a matter of law, Purnell's mistaken use of his firearm was objectively reasonable and therefore no constitutional right of Henry's was violated. *See Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 360 (4th Cir. 2010) (noting that Article 26 of the Maryland Declaration of Rights "is interpreted *in pari materia* with the Fourth Amendment").

However, if an objective reasonableness determination could not be made due to the existence of outstanding material issues of fact, Purnell may still prevail on the federal claim if the constitutional right that forms the basis for Henry's suit was not clearly established at the time of the shooting. As explained below, our analysis of the second prong of the qualified immunity inquiry may not dispose of Henry's state law claim. We therefore exercise our discretion to employ the traditional, two-step qualified immunity procedure laid down in *Saucier v. Katz*, 533 U.S. 193, 201 (2001) to determine if Henry's federal and state claims are resolved by an analysis of his rights under the Fourth Amendment.[6] *See Pearson*, 129 S. Ct. at 818.

---

[6]The Supreme Court's recent decision in *Pearson* overruled that part of *Saucier* which mandated that courts conduct the two-step qualified immunity inquiry in sequential order. *See Pearson*, 129 S. Ct. at 813. Courts now "have the discretion to decide whether that procedure is worthwhile" and "determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case." *Id.* at 821. Otherwise, *Saucier* remains as binding precedent. As noted above, employing the full *Saucier* analysis is prudent in this case due to the possible disparate treatment of Henry's federal and state claims.

Under *Saucier*, we first consider whether Henry's allegations make out the violation of a constitutional right, *see* 533 U.S. at 201, a question on which Henry bears the burden of proof. *See Henry*, 501 F.3d at 377. The only constitutional right at issue here is the Fourth Amendment right to be free from seizures effectuated by excessive force. Establishing a violation of that right requires Henry to demonstrate that "the seizure in this case was unreasonable (*i.e.*, that Purnell's mistake in using the Glock rather than the [t]aser was unreasonable)." *Id.* at 384; *see also Milstead v. Kibler*, 243 F.3d 157, 164-65 (4th Cir. 2001), *abrogated on other grounds by Pearson*, 129 S. Ct. at 818. This "reasonableness" inquiry is undertaken "from the perspective of a reasonable officer on the scene," bereft of "the 20/20 vision of hindsight."[7] *Graham*, 490 U.S. at 396.

Qualified immunity does not "override the ordinary rules applicable to summary judgment proceedings," *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005), nor does it "give special substantive favor to the defense." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) (quotation omitted). Hence, our longstanding instruction that courts "reserve[ ] for trial" genuine issues of material fact relating to an "officer's con-

---

[7]Under the totality of the circumstances, we "gauge" Fourth Amendment reasonableness by examining an officer's actions and "measur[ing] them against what a reasonable police officer would do under the circumstances." *Schultz*, 455 F.3d at 477 (quotations omitted). "[M]any situations which confront officers in the course of executing their duties are more or less ambiguous." *Mazuz v. Maryland*, 442 F.3d 217, 225 (4th Cir. 2006), *abrogated on other grounds by Pearson*, 129 S. Ct. at 818. The Fourth Amendment thus allows "for some mistakes" by officers, provided their missteps are objectively reasonable. *Id.* To determine whether a mistake is objectively reasonable, we "filter[ ]" the "objective facts . . . through the lens of the officer's perceptions at the time of the incident in question," focusing "on what the police officer reasonably perceived." *Milstead*, 243 F.3d at 163 (quotations omitted). "In short, a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment." *Id.* at 165.

duct or its reasonableness under the circumstances." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992). For summary judgment to be appropriate, there must be "no genuine issues of material fact" and the "undisputed facts" must establish that "the defendant . . . is entitled to judgment as a matter of law."[8] *Id.*

The record reflects, however, that unresolved questions of material fact render a merits resolution of Henry's excessive force claim inappropriate for summary judgment, at least as to the issue of objective reasonableness. *See Melgar*, 593 F.3d at 356. The district court summarily dismissed Henry's arguments that a reasonable officer would have issued a warning before attempting to fire his taser, and that the taser's visible laser sight and thumb lock would have caused a reasonable officer to be aware that he had mistakenly drawn his firearm instead. *See Henry*, 559 F. Supp. 2d at 652 n.3. We hold that the district court's reasoning in this regard was speculative; a jury could legitimately view each of these factors differently, particularly after considering the testimony of an expert witness. *See, e.g.*, *Wellington v. Daniels*, 717 F.2d 932, 934 (4th Cir. 1983) (recounting the testimony of "an expert on police procedure and equipment"). At this stage of the proceeding, there remain material factual issues in dispute on the failure to warn, to utilize the laser sight, and to distinguish the different safety locks, all of which are relevant to a decision on the objective reasonableness of the seizure. The district court's determination that Deputy Purnell's conduct was reasonable as a matter of law was thus in error.

---

[8]Although, as just noted, the district court employed the wrong standard in evaluating the evidence on the question of objective reasonableness, we may still uphold the district court's judgment in Deputy Purnell's favor if, as a matter of law, no genuine issues of material fact remain outstanding. *See Pitt County v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir. 2009) (recognizing that we may affirm the district court's judgment based "on any grounds apparent from the record") (quotation omitted).

To be clear, we do not decide the merits of Henry's claim for excessive force (*i.e.*, whether Purnell's mistaken use of his firearm was reasonable). *See Henry*, 501 F.3d at 384. We merely recognize that "the issue before us on summary judgment is fairly narrow." *Schultz*, 455 F.3d at 479. Because material factual issues exist as to the reasonableness of Deputy Purnell's actions, summary judgment based on that issue should not have been granted. *See Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996).

## C.

Having determined that the first prong of the *Saucier* inquiry does not support the award of summary judgment to Purnell, we now turn to the second prong. In that regard, the Supreme Court has long emphasized that qualified immunity is designed "to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Accordingly, the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 129 S. Ct. at 815 (quotation omitted). We thus strive to avoid "forc[ing] the parties to endure additional burdens of suit . . . when the suit otherwise could be disposed of more readily." *Id.* at 818 (quotation omitted).

Although "qualified immunity is an immunity from suit" designed to be resolved at the "earliest possible stage" of the case, *id.* at 815 (quotations omitted), the case at bar is now in its sixth year and on its third appeal to this Court, *see Henry*, 501 F.3d at 374; *Henry*, 119 Fed. Appx. at 441. The history of this case exemplifies the strong public policy justifications for resolving the question of qualified immunity at the earliest stage in the litigation. Moreover, both parties have asked that we resolve the qualified immunity issue now. Clearly, resolving this purely legal issue at this time "will best facilitate the

fair and efficient disposition of" the case.[9] *Pearson*, 129 S. Ct. at 821. Accordingly, we exercise our discretion to determine whether a Fourth Amendment right, "in light of the specific context of the case," was clearly established at the time of the shooting. *Saucier*, 533 U.S. at 201; *see, e.g.*, *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999).

The qualified immunity test originally set out by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) has been expressed in a variety of ways. For example, the Court has inquired whether "[t]he contours of" a plaintiff's asserted right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right," *i.e.*, whether "in the light of pre-existing law the unlawfulness" of "an official action is . . . apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court has also phrased "[t]he dispositive inquiry in determining whether a right is clearly established [as] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, or "whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information [he] possessed." *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

Regardless of which formulation is used, it is clear under *Saucier* that the purpose of the qualified immunity inquiry is "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."[10] 533 U.S. at 206. This principle serves fundamental concerns of fairness: "Officers

---

[9]*See also Willingham*, 412 F.3d at 559 (noting that the second prong of the *Saucier* test "is always capable of decision at the summary judgment stage," as "[t]he existence of disputed material facts . . . does not alter the 'essentially legal' nature of" our analysis (quotation omitted)).

[10]*See also Davis v. Scherer*, 468 U.S. 183, 195 (1984) ("The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated.").

sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with . . . criminal offense[s] . . . ." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[T]he qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *United States v. Lanier*, 520 U.S. 259, 270-71 (1997).

"That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ." *Hope*, 536 U.S. at 739. A right may be clearly established "even in novel factual circumstances," *id.* at 741, "but [i]f the law [does] not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. And rightly so, for the Supreme Court has made clear "that the *Harlow* standard . . . gives ample room for mistaken judgments," *Malley v. Briggs*, 475 U.S. 335, 343 (1986), "protecti[ng] . . . all but the plainly incompetent or those who knowingly violate the law." *Id.* at 341.

In particular, the principles laid out by the Supreme Court in *Saucier* guide the resolution of the case at bar. *Saucier* was also a case where the plaintiff's cause of action was based on a claim of excessive force in violation of the Fourth Amendment. *See* 533 U.S. at 198-99. The defendant police officer moved for summary judgment on the grounds of qualified immunity, but the district court denied the motion because material facts remained in dispute on the excessive force claim. *See id.* at 199. The district court held "that in the Fourth Amendment context, the qualified immunity inquiry is the same as the inquiry made on the merits." *Id.* (quotation and alteration omitted). The Ninth Circuit agreed, concluding "that qualified immunity is merely duplicative in an excessive force case, eliminating the need for the second step where a

constitutional violation could be found based on the allegations." *Id.* at 203.

While the concurring opinion in *Saucier* approved this methodology for establishing qualified immunity, *see id.* at 213-15 (Ginsburg, J., concurring in the judgment), the majority of the Supreme Court flatly rejected it: "This approach cannot be reconciled with *Anderson v. Creighton*, 483 U.S. 635 (1987)." *Id.* at 200. Writing for the majority, Justice Kennedy explained:

> The approach the Court of Appeals adopted—to deny summary judgment any time a material issue of fact remains on the excessive force claim—could undermine the goal of qualified immunity to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

*Id.* at 202.[11]

Specifically, the Supreme Court rejected the argument advanced by the minority concurring opinion that "[o]nce it has been determined that an officer violated the Fourth Amendment by using 'objectively unreasonable' force as that term is explained in *Graham v. Connor*, there is simply no

---

[11]The restriction noted in *Malley* has no application in the case at bar because Henry neither pleads, nor would the record support, a claim that Purnell's actions were those of an officer who was "plainly incompetent" or "who knowingly violated the law."

work for a qualified immunity inquiry to do." *Id.* at 216-17 (Ginsburg, J., concurring in the judgment). To the contrary, the Supreme Court explicitly held that "[t]he inquiries for qualified immunity and excessive force remain distinct, even after *Graham*." *Id.* at 204.

Until such time as the Supreme Court changes the judicial framework of the qualified immunity defense, we are bound to follow its direction. And that direction after *Saucier* is clear: In the context of a claimed Fourth Amendment violation for the use of excessive force, when the objective reasonableness of the official's actions cannot yet be determined, an analysis of the qualified immunity defense based on whether the law is "clearly established" is a separate and required judicial action.[12]

The contours of that qualified immunity inquiry were laid out in *Saucier*.

> This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . .

---

[12]As the parties have agreed, this case requires no additional factual determinations in order to resolve the qualified immunity issue. All necessary facts are before us so that the question of qualified immunity can and should be answered. We have established that "[t]he existence of disputed material facts—which must be submitted to a jury—does not alter the essentially legal nature of the question of whether the right at issue was clearly established." *Willingham*, 412 F.3d at 559 (internal citation and quotation omitted). And "the legal question of a defendant's entitlement to qualified immunity under particular set of facts" is "decided by the court, not by the jury" because "juries are ill-suited to make the determinations of law required by the qualified immunity analysis." *Id.* at 560. We may, therefore, always resolve "the purely legal question of whether the constitutional right at issue was clearly established . . . at the summary judgment stage," *id.* at 559 (quotation omitted), as "[e]ntitlement to qualified immunity is a legal question . . . decided [by] the court." *Int'l Ground Transp., Inc. v. Mayor & City Council of Ocean City*, 475 F.3d 214, 220 n.3 (4th Cir. 2007).

. . . . [W]e emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. at 640. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See *Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("[A]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established[.]").

*Id.* at 201-02.

In the case at bar, Henry and the dissent contend the appropriate level of inquiry is whether "a police officer who shoots a fleeing suspect without probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others violates that suspect's Fourth Amendment rights." Dissent at 30 (quotation omitted); *see also* Opening Brief at 42. However, this is where their argument goes off track and is reminiscent of the concurring opinion in *Saucier*, which is not the controlling law.[13]

---

[13]The dissent applies the second prong of the *Saucier* test at a high level of generality and thus reaches a result that "bear[s] no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Anderson*, 483 U.S. at 639. In so doing, it compounds the error made by the Eighth Circuit in *Anderson*, *i.e.*, refusing to consider whether a constitutional violation "was . . . clearly established [in] the circumstances with which [the officer] was confronted." *Id.* at 640. But, as the Supreme Court has explained, determining whether qualified immunity applies requires "more than an assertion that [the] general right [Purnell] was alleged to have violated . . . was clearly established." *Id.* "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense." *Id.*

A reasonable police officer would know that shooting an unarmed suspect fleeing on a misdemeanor child support warrant, without more, would constitute use of excessive force contrary to the Fourth Amendment. But if that very generalized view was all it took to show "clearly established law" in the qualified immunity context, then the inquiry on the second *Saucier* prong would be a useless exercise. Put simply, context matters. The Supreme Court spoke plainly to this point in *Anderson*:

> The operation of [the qualified immunity] standard . . . depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis*, supra, 468 U.S. at 195.

483 U.S. at 639-40.

If the level of generality advanced by Henry were to apply, *Anderson* would have been decided differently. The simple truism that a reasonable officer would know in the abstract that a warrantless search of a home without probable cause and exigent circumstances violated the Fourth Amendment would be all that was needed. However, in *Anderson*, this level of generality was rejected because it failed to account for the fact

> that it was *not* clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances. . . .
>
> . . . . The relevant question in th[at] case, for example, [was] the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.

*Id.* at 640-41.

Similarly, in *Saucier*, a reasonable officer would know, in the abstract, that use of excessive force to remove a demonstrator would violate the Fourth Amendment. *See* 533 U.S. at 201-02. However, that over-simplified, generalized approach to the qualified immunity inquiry was adjudged faulty because it utterly failed to apply a level of specificity to the particular circumstances of the case. As with *Anderson*, had Henry's generalized formulation of the qualified immunity inquiry applied, *Saucier* would have been decided differently. The Supreme Court has been clear that only in the "specific context of the case," *id.* at 201, can the issue of qualified immunity be properly determined.

The formulation of the scope of the qualified immunity inquiry by Henry and the dissent fails to take account of the "specific context of the case." *Id.* That context is not simply that Henry was shot, but also that it is a stipulated fact that the shooting was an unintended mistake by Purnell. Furthermore, as our previous decision in this case established, "Henry does not argue that Purnell's decision to use the [t]aser was unreasonable." 501 F.3d at 382 n.11.

Thus, the specific context of this case is where a police officer, who would have acted reasonably in using the taser to apprehend Henry, draws his firearm by mistake and unintentionally shoots Henry instead.[14] The qualified immunity inquiry thus becomes whether an officer in that "specific context" would know that an act of weapon confusion of the firearm for the taser was "clearly established" as an excessive use of force under the Fourth Amendment. The answer is that neither in 2003, nor indeed today, is there clearly established law to resolve that question for courts, much less police officers in the field. At the time of the shooting, case law did not exist that applied the Fourth Amendment to the specific context in which Deputy Purnell acted. Deputy Purnell could not have been on notice because no case gave him fair warning that such weapon confusion violated the Fourth Amendment as a use of excessive force.[15]

---

[14]We recognize that whether tasing Henry without a warning is an open question in the objective reasonableness inquiry, however, the validity of using a taser to apprehend Henry is not an open question and is the law of the case. *See TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (explaining that "once the decision of an appellate court establishes the law of the case" it generally "must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal" (quotation omitted)).

[15]The dissent contends the application of the second *Saucier* prong in this case "transforms the doctrine of qualified immunity into a subjective inquiry." Dissent at 30. We might agree with the dissent on this point but for the specific, and perhaps unique, admitted facts of this case. It is stipulated that Deputy Purnell's drawing of his firearm, instead of the taser,

We agree with the District Court in *Torres v. City of Madera*, 655 F. Supp. 2d 1109 (E.D. Cal. 2009), which considered the nearly identical question of firearm for taser weapon confusion, that the police officer is entitled to qualified immunity.[16] "At the time of the . . . shooting there was no clearly established federal law on what would make an officer's mistaken use of her gun instead of her [t]aser unreasonable." 655 F.

---

was a good-faith, unintentional mistake of weapon confusion. Thus, the inquiry in the case at bar is based upon an objective fact about which there is no dispute, the weapons were confused. This inquiry does not require the district court to determine any fact based on a subjective thought of the officer. *See also infra* note 18.

[16]The dissent sees as contradictory our simultaneous conclusions "that the district court erred in finding that [Purnell's] mistake was reasonable" and that Purnell is nonetheless "entitled to qualified immunity." Dissent at 30. This critique fails, however, because it is based on the unwarranted assumption that Purnell's "mistaken conduct was unreasonable for Fourth Amendment purposes." *Id.* at 31; *see also id.* at 30 (referring to Purnell's "unreasonable mistake"); *id.* at 32 (asserting we have disregarded Purnell's "objectively unreasonable mistake"); *id.* at 34 (claiming that an "unreasonable [mistake] . . . cannot be the basis for excusing an officer's conduct during the qualified immunity inquiry"); *id.* at 34 (stating that an "officer who unreasonably mistakes his gun for his taser cannot claim that his error was based on his reasonable failure to apply the law to the specific facts he faced"); *id.* at 36 (labeling Purnell's actions "objectively unreasonable in light of the suspect's specific conduct and the crime that suspect allegedly committed").

As explained above, the present record does not support a judicial determination as to the objective reasonableness of Deputy Purnell's actions. In so much as material issues of fact remain outstanding, we cannot now resolve the legal question of whether Purnell's actions complied with the Fourth Amendment until these issues are resolved by the finder of fact. *See Willingham*, 412 F.3d at 560 (acknowledging that "the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury"). Our holding that the district court erred in resolving the Fourth Amendment question rests, therefore, not on the assumption that Purnell's mistake was unreasonable, but only on a faithful application of the standard for summary judgment established by Federal Rule of Civil Procedure 56.

Supp. 2d at 1125. In that circumstance, no police officer would have "fair notice" that a mistake of weapon confusion contravened "clearly established" law.[17]

Although we cannot say whether Deputy Purnell's mistaken use of his firearm was objectively reasonable under the circumstances, we can say that Purnell lacked "fair notice" regarding the potential unlawfulness of his actions. *Hope*, 536 U.S. at 739. At the second stage of the *Saucier* inquiry, "[t]he decisive fact is not" whether an officer's position was correct, "but that the question was open at the time he acted." *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985).

The lawfulness of Deputy Purnell's conduct was thus "open to reasonable dispute" at the time of the shooting, and officers are personally liable only "for transgressing bright lines," not for intruding into "gray areas." *Wilson*, 337 F.3d at 403 (quotation omitted). Consequently, Deputy Purnell is entitled to summary judgment in his favor on Henry's § 1983 claim.[18]

---

[17]The dissent relies on *Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008) to support its conclusion that Deputy Purnell is not entitled to qualified immunity and contends that case is "legally indistinguishable from this one." Dissent at 33. The undisputed factual basis of *Floyd*, however, differs significantly from the case at bar. The officer in *Floyd*, for example, intended to shoot the suspect in circumstances in which "his purported conduct was patently *unreasonable*." *Floyd*, 518 F.3d at 409; *see also id.* at 408 ("[Officer] Reynoso's purported belief that [Officer] Quaine had been shot by an unarmed suspect . . . rested solely on [Officer] Reynoso's observation of [Officer] Quaine taking cover."). In these circumstances, it is hardly surprising that the Sixth Circuit concluded that Floyd's "right to be free from such excessive force was clearly established on the date in question." *Id.* at 409. Deputy Purnell, in contrast, did not intend to shoot Henry and the reasonableness of his mistake is a much closer question.

[18]The dissent posits that our resolution of the qualified immunity issue must be erroneous because if the parties had not agreed that Purnell's use of the gun, instead of the taser, was a "good-faith error," a trial would be required. Dissent at 31. Thus, the dissent argues our "analysis cannot be . . . correct . . . because it is incapable of resolving mistaken-shooting claims at the earliest possible stage in litigation." *Id.* (quotation omitted). We respectfully disagree.

*See Saucier*, 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

We do not find Henry's contrary argument based on *Groh v. Ramirez*, 540 U.S. 551 (2004) persuasive. Henry cites Justice Kennedy's dissenting opinion in *Groh* for the proposition that "[m]istakes of fact can be relevant to the second prong of the qualified immunity analysis only when they affect the officer's assessment of the legality of his conduct." Opening Brief at 43 n.15 (citing *Groh*, 540 U.S. at 566-67 (Kennedy, J., dissenting)). Because "Deputy Purnell has not suggested that anything about the situation before him misled him to believe that he could permissibly use deadly force," *id.*, Henry argues that Deputy Purnell's intent to employ his taser "does not change the analysis under the second prong of the qualified immunity inquiry." *Id.* at 42.

Henry's argument is misplaced for at least three reasons. First, Purnell's seizure of Henry occurred in 2003, a year before the Supreme Court issued its opinion in *Groh*. Any application of *Groh* is, therefore, irrelevant to our analysis of clearly established law at the time of Purnell's alleged misconduct. *See Hope*, 536 U.S. at 739 (noting that courts consider whether a right is clearly established "in the light of *pre-existing* law" (quotation omitted)) (emphasis added). Second, we have found no support for the proposition that a dissent

---

Of course, material facts must be established in order for a court to determine whether qualified immunity applies in any given situation. If the parties' pleadings disputed whether Purnell made a good faith error of weapon confusion, summary judgment could not proceed because material facts would be in dispute. Put simply, "the earliest possible stage in litigation" for application of the qualified immunity analysis would not have arrived. However, once the fact of good faith error has been objectively established, as by stipulation in this case, there is no barrier to the resolution of the second prong of *Saucier*.

may propound clearly established law for purposes of determining qualified immunity.

Third, even if we were to assume that Henry has correctly stated the relevant law, Deputy Purnell's mistake of fact *did* affect his "assessment of the legality of his conduct." Opening Brief at 43 n.15. The mistake of fact at issue here is Purnell's mistaken belief that he was firing his taser, instead of his firearm. And this mistake clearly influenced Purnell's assessment of the legality of his conduct. Purnell has never asserted that he could permissibly use deadly force to halt Henry's flight, but he has consistently argued that his intended use of a taser was appropriate. *See, e.g.*, Response Brief at 49-50. As noted earlier, "it is undisputed that [Purnell's] *intended* use of . . . force was justified: Purnell had the right to use his [t]aser to detain Henry, a suspect fleeing arrest."[19] *Henry*, 559 F. Supp. 2d at 651-52 (emphasis in original); *see also Henry*, 501 F.3d at 382 n.11 ("Henry does not argue that Purnell's decision to use the [t]aser was unreasonable."). Henry's argument based on *Groh*, which he identified as his "best case" on the question of qualified immunity, is thus without merit.

## V.

The test for statutory immunity under Maryland law differs significantly from the qualified immunity analysis applicable under federal law. *See Melgar*, 593 F.3d at 360. Henry's claim under the Maryland Constitution's Declaration of

---

[19]In this appeal, Henry argues for the first time that Purnell's intended use of his taser was itself potentially unreasonable. *See, e.g.*, Opening Brief at 18 ("[I]t is a jury question whether Deputy Purnell could have reasonably used his [t]aser on Mr. Henry."). This claim has clearly been waived. *See United States v. Evans*, 404 F.3d 227, 236 n.5 (4th Cir. 2005) (recognizing that failure to raise an argument before the district court waives that argument on appeal). Accordingly, we do not consider it. *See United Rentals, Inc. v. Angell*, 592 F.3d 525, 531 n.3 (4th Cir. 2010) ("Because this argument is raised for the first time on appeal, we do not consider it.").

Rights is, therefore, not resolved by our analysis of his federal claim. As the Court of Appeals of Maryland has explained, "[u]nlike qualified immunity from claims of violations of federal rights under § 1983, the question of immunity for State personnel from State law torts is a subjective one." *Newell v. Runnels*, 967 A.2d 729, 763 (Md. 2009).

Statutory immunity applies to Maryland state personnel who commit "a tortious act or omission . . . within the scope of the[ir] public duties," provided the act or omission "is made without malice or gross negligence." *Okwa v. Harper*, 757 A.2d 118, 128 (Md. 2000) (quotation omitted). To commit "gross negligence," a wrongdoer must "inflict[ ] injury intentionally" or be "so utterly indifferent to the rights of others" as to "act[ ] as if such rights d[o] not exist." *Newell*, 967 A.2d at 764-65 (quotation omitted).

We, therefore, reverse the district court's grant of summary judgment on Henry's state-law claim and remand to the district court, which may then determine whether to exercise supplemental jurisdiction over that claim. *See Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 553 n.4 (4th Cir. 2006) (explaining that once the "federal claims in an action" are dismissed the district court possesses "wide discretion to dismiss the supplemental state law claims over which it properly has supplemental jurisdiction") (quotation omitted). If the district court chooses to exercise supplemental jurisdiction over Henry's state-law claim, it may then determine whether Purnell is entitled to statutory immunity under Maryland law.

## VI.

For the reasons set forth above, we affirm in part and reverse in part the judgment of the district court, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*REVERSED IN PART, AND*
*REMANDED WITH INSTRUCTIONS*

GREGORY, Circuit Judge, dissenting:

Under clearly established law, a police officer who shoots a fleeing suspect without "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" violates that suspect's Fourth Amendment rights. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). In this case, Officer Purnell shot a fleeing suspect whom he had no reason to believe was a threat to anyone. And yet the majority holds that Officer Purnell is entitled to qualified immunity because he discharged his firearm by mistake, even though the majority simultaneously admits that the district court erred in finding that the mistake was reasonable. By allowing an unreasonable mistake to serve as the basis for establishing qualified immunity and focusing its inquiry on Officer Purnell's intent rather than his or the suspect's objective behavior, the majority impermissibly transforms the doctrine of qualified immunity into a subjective inquiry that excuses, not guides, reasonable officer conduct.

In its opinion, the majority frames the inquiry as:

> whether an officer in that "specific context" would know that an act of weapon confusion of the firearm for the taser was "clearly established" as an excessive use of force under the Fourth Amendment.

Maj. Op. at 24. In other words, the majority ignores what a reasonable officer would have known about the situation he faced and instead paradoxically asks whether this specific officer would know that he could not unreasonably confuse his gun for his taser. This is not the correct inquiry.

Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law,

could reasonably believe that their actions were lawful. *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled in part*, *Pearson v. Callahan*, 129 S. Ct. 808 (2009); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Crucially, though, an officer's subjective belief about the nature of his conduct is "irrelevant" for qualified immunity purposes. *Anderson*, 483 U.S. 641. Courts are charged with asking only whether the officer's actual conduct, in light of the objective circumstances, was barred by clearly established law. *See Saucier*, 533 U.S. at 202 (explaining that the relevant question for qualified immunity purposes is "whether it would be clear to a reasonable officer that his *conduct* was unlawful in the situation he confronted" (emphasis added)). The majority fundamentally errs, then, by focusing its inquiry on Officer Purnell's intended conduct, rather than his actual conduct, given that it must accept that the mistaken conduct was unreasonable for Fourth Amendment purposes.

The fact that "qualified immunity is 'an immunity from suit rather than a mere defense to liability [that] is effectively lost if a case is erroneously permitted to go to trial,'" *Pearson*, 129 S. Ct. at 815 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (internal alterations omitted), demonstrates that unreasonable volitional or cognitive mistakes cannot be a part of the qualified immunity inquiry. The parties before us concede that Officer Purnell made a good-faith error when he deployed his gun rather than his taser. But suppose the officer's subjective intent were in dispute, with the officer claiming that he made a mistake and the suspect alleging that he was shot intentionally. In that case, under the majority's analysis, the district court would have to hold a trial in order to resolve the qualified immunity issue. At base the majority's analysis cannot be the correct test because it is incapable of resolving mistaken-shooting claims "at the earliest possible stage in litigation." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The majority is also quite wrong to claim that disregarding Officer Purnell's objectively unreasonable mistake while conducting the qualified immunity inquiry would lead to a result contrary to that reached by the Supreme Court in *Saucier* or *Anderson*. In *Saucier*, the Court considered whether an officer who dragged and shoved a suspect who attempted to cross a barrier separating the public from the Vice President of the United States, violated the suspect's clearly established rights. 533 U.S. at 208. Given existing precedent that allowed for some degree of physical force when making an arrest and given the particularly dangerous threat the suspect may have posed, the Court held that a reasonable officer could believe that his actions were legal. *Id.* The Court's inquiry focused squarely on the specific conduct of the officer and the suspect and how a reasonable person would view those actions, without any regard for what the officer thought he was doing.

Likewise, in *Anderson*, the Court considered a police officer's warrantless search of the plaintiffs' home undertaken with the mistaken belief that a suspected bank robber was present. 483 U.S. at 637. In finding that the broad rule that warrantless home searches conducted without probable cause or exigent circumstances was insufficient to put a reasonable officer on notice that his conduct was illegal in these circumstances, the Court explained that the relevant inquiry was whether the objective circumstances could be considered exigent or could establish probable cause. *Id.* at 640-41. The Court specifically emphasized, though, that the officer's "subjective beliefs about the search are irrelevant." *Id.* at 641. Once again, the relevant analytical tool, the Court made clear, is the application of established legal principles to objective conduct, not subjective thoughts.

Applying *Saucier* and *Anderson* to this case, it is clear what the proper qualified immunity analysis should look like. Under settled law, a police officer may not shoot a fleeing suspect unless the officer has probable cause to believe that the suspect is dangerous. *Garner*, 471 U.S. at 11. Therefore,

Officer Purnell would only be entitled to qualified immunity if a reasonable officer could believe that *Garner* was inapplicable given the suspect's objective behavior or his own, objective conduct.* Once the court determines that Officer Purnell's mistaken use of his gun was unreasonable under the Fourth Amendment, it should ask whether a reasonable officer could believe that his actual conduct complied with *Garner* given what the suspect actually did. But both *Anderson* and *Saucier* make clear that the qualified immunity inquiry does not ask what the officer subjectively and unreasonably thought his or the suspect's conduct to have been.

The Sixth Circuit demonstrated this analysis in a mistaken-shooting case that is legally indistinguishable from this one. In *Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008), the defendant police officer claimed that he shot an unarmed suspect under the mistaken belief that the suspect had fired at a fellow officer. *Id.* at 408. Having determined that the officer's mistaken belief was unreasonable, the Sixth Circuit denied him qualified immunity and refused to apply a second level of deference to that mistake. *Id.* As the court noted when applying *Saucier*:

> the failure of both officers to properly assess the reality of the situation they created before employing deadly force without warning against an unarmed

---

*I do not say, as the majority claims, that there is no room for a qualified immunity analysis in excessive or deadly force cases. My point is, rather, that the inquiries are fundamentally different. Officer Purnell would still be entitled to qualified immunity in this case if his actual conduct were reasonable, even if unlawful, under the circumstances. He could, for instance, argue that he reasonably believed that Henry was dangerous, even though he lacked probable cause to shoot him. Or that he reasonably believed that *Garner* did not apply to suspects fleeing in the specific manner in which Henry fled. But he cannot successfully argue that his intended conduct would have been legal, given that his failure to do that which he intended was objectively unreasonable. Accepting this argument requires us to extend qualified immunity to the "plainly incompetent." *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).

suspect cannot shield them from liability unless that
failure was objectively reasonable.

*Id.* Once a mistake is found to be unreasonable, it cannot be
the basis for excusing an officer's conduct during the quali-
fied immunity inquiry.

For the majority to then claim that the "specific context"
that mattered in *Saucier* or *Anderson* was the subjective char-
acteristics or intentions of the officer is a classic bait-and-
switch. More importantly, it transforms qualified immunity
from a rule designed to guide reasonable officers' conduct
and, in turn, hold officers accountable for not conforming
their conduct to a reasonable interpretation of that guidance,
into a rule that can be used to simply excuse all subjective
deviations from the normal standard of care.

Qualified immunity guides and protects reasonable officers
acting in grey areas of the law by "allow[ing] some room for
discretionary judgment in what are indisputably difficult cir-
cumstances." *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348,
357 (4th Cir. 2010). Importantly, the hypothetical reasonable
officer must *knowingly* judge the legality of his conduct, pre-
cisely because the qualified immunity standard assumes that
public officials will be guided by the law that has been clearly
established. *Harlow*, 457 U.S. at 818. An officer who unrea-
sonably mistakes his gun for his taser cannot claim that his
error was based on his reasonable failure to apply the law to
the specific facts he faced. Any further consideration of his
subjective and unreasonable failure to know that he was using
deadly force therefore is incompatible with the assumption
underlying qualified immunity that officers are guided by the
law.

If courts, when conducting the qualified immunity analysis,
must consider an officer's subjective propensities, then the
analysis ceases to guide the reasonable officer. Once courts
begin to consider each individual officer's experience — her

years on the force, her Intelligence Quotient, whether or not she suffers from attention deficit disorder — and consider how an officer with those characteristics would behave in a given factual scenario, then it is difficult to conceive of a case in which an officer would ever be denied qualified immunity. Qualified immunity becomes simply a post-hoc rationalization, not a guide for future conduct.

***

The doctrine of qualified immunity is a judge-made rule designed to strike the classic balance between freedom and security. *See Pearson*, 129 S. Ct. at 815 (noting that qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably"). When an officer, for example, pursues a fleeing suspect into a private residence or apprehends a suspect who reasonably appears to be menacing the Vice President, it is easy enough to see how and why the balance favors the officer. Where the constitutional question is close, the harm done to society when an officer is impeded by the threat of financial liability from doing that which he reasonably believes is legal and necessary to seize dangerous criminals, outweighs the harm done to the individual whose rights are marginally violated.

But this balance cannot be squared with an officer's unreasonable use of deadly force. We sacrifice both liberty and security when we allow police officers to shoot unarmed suspects without any reasonable basis for doing so. Police officers operating under stressful conditions requiring quick thinking have every right to know that their reasonable mistakes as to the law and relevant facts will be excused. But once it is determined that their legal and factual conclusions were unreasonable, we should not then ask the unanswerable, as the majority does when asking whether an officer unrea-

sonably prone to accidents would have known that his unreasonableness was unreasonable under the circumstances.

As Justice Holmes put it in his seminal work, "The law takes no account of the infinite varieties of temperament, intellect, and education which make the internal character of a given act so different in different men." Oliver Wendell Holmes, Jr., The Common Law 108 (Little, Brown, & Co. 1909) (1881). Unlike the "courts of Heaven," our courts of law require officials to conform to objective rules and objective facts, regardless of whether they are "born hasty and awkward, [are] always having accidents and hurting [themselves] or [their] neighbors." *See id.*

Officer Purnell failed to conform his conduct to the Supreme Court's specific mandate that police not use deadly force against suspects who are unarmed and who pose no threat to the officer or others. He did so in circumstances that were objectively unreasonable in light of the suspect's specific conduct and the crime that suspect allegedly committed. We have no power to excuse that conduct simply because Officer Purnell's failure to behave as a reasonable officer was an accident.

I respectfully dissent.