PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FREDERICK P. HENRY,
                    *Plaintiff-Appellee,*

v.

ROBERT PURNELL,
                    *Defendant-Appellant.*

No. 06-1523

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:04-cv-00979-JFM)

Argued: May 24, 2007

Decided: September 20, 2007

Before WILLIAMS, Chief Judge, SHEDD, Circuit Judge,
and WIDENER, Senior Circuit Judge.[1]

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Shedd wrote the opinion, in which Chief Judge Williams
joined.

## COUNSEL

John Francis Breads, Jr., LOCAL GOVERNMENT INSURANCE

[1]Judge Widener heard oral argument in this case but did not participate
in the decision. The opinion is filed by a quorum of the panel pursuant
to 28 U.S.C. § 46(d).

TRUST, Columbia, Maryland, for Appellant. Eric M. May, Washington, D.C., for Appellee.

---

**OPINION**

SHEDD, Circuit Judge:

While attempting to use a Taser to stop Frederick P. Henry from fleeing arrest, Somerset County (Maryland) Deputy Sheriff Robert Purnell mistakenly drew his firearm, rather than his Taser, from his holster. Not realizing the mistake, Purnell then shot and wounded Henry. Consequently, Henry filed this action under 42 U.S.C. § 1983, and Articles 24 and 26 of the Maryland Declaration of Rights, claiming that Purnell violated his right to be free from the use of excessive force during arrest. Purnell moved for summary judgment, arguing that he did not violate Henry's rights and, in any event, that he is entitled to qualified immunity on the § 1983 claim and Maryland statutory immunity on the state-law claim. The district court denied the motion, *Henry v. Purnell*, 428 F. Supp. 2d 393 (D. Md. 2006), and Purnell now appeals. For the reasons that follow, we affirm the district court's order in part, vacate it in part, and remand this case for further proceedings.

I

We have jurisdiction to review "final decisions" of district courts, 28 U.S.C. § 1291, and "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of . . . § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Our jurisdiction over an interlocutory appeal of the denial of qualified immunity also provides a basis for consideration of other district court rulings that are "inextricably intertwined with the decision of the lower court to deny qualified immunity" or when "consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question." *Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996). Claims are "inextricably intertwined" when the resolution of one claim necessarily resolves the other claim. *Altman v. City of High Point*, 330 F.3d 194, 207 n.10 (4th Cir. 2003).

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [government] conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When a government official properly asserts qualified immunity, the threshold question that a court must answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201.[2] "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" — that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201, 202.

The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003).[3] The plaintiff bears the burden of proof on the first

---

[2]Qualified immunity "is an affirmative defense that must be pleaded by a defendant official." *Harlow*, 457 U.S. at 815. Because an official "who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity," the defendant bears the initial burden "of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." *In re Allen*, 106 F.3d 582, 593, 594 (4th Cir. 1997) (internal punctuation omitted). Henry does not challenge Purnell's assertion of the qualified immunity defense.

[3]When resolving cases on the first *Saucier* question, courts sometimes state that the absence of a constitutional violation entitles the defendant to qualified immunity. At least one circuit court has specifically rejected

question — *i.e.*, whether a constitutional violation occurred. *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993) ("Once the defendant raises a qualified immunity defense, the plaintiff carries the burden of showing that the defendant's alleged conduct violated the law"); *see also Crawford-El v. Britton*, 523 U.S. 574, 589 (1998) (noting that the Court's qualified immunity holding in *Harlow* "related only to the scope of an affirmative defense" and did not change "the plaintiff's burden of proving a constitutional violation"); *Carr v. Deeds*, 453 F.3d 593, 608 (4th Cir. 2006) (affirming summary judgment in qualified immunity appeal "because the plaintiff failed to bring forth admissible evidence from which the jury could conclude" that the officer used excessive force); *Figg v. Schroeder*, 312 F.3d 625, 642 (4th Cir. 2002) (noting that a § 1983 plaintiff "must prove the illegality of the seizure"). The defendant bears the burden of proof on the second question — *i.e.*, entitlement to qualified immunity. *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) ("The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official."); *see also Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (same); *Tanner v. Hardy*, 764 F.2d 1024, 1027 (4th Cir. 1985) ("It is a well established principle that qualified immunity

---

this approach, noting that a defendant in that instance prevails not because of qualified immunity but, instead, because the plaintiff "did not prove an essential element of the § 1983 claim." *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007). In several recent opinions, the Supreme Court appears to have segregated the initial *Saucier* inquiry of whether a constitutional violation occurred from the second inquiry of whether the defendant is entitled to qualified immunity. *See, e.g., Morse v. Frederick*, ___ U.S. ___, 127 S. Ct. 2618, 2624 & n.1 (2007) (expressly declining to decide the case on qualified immunity grounds based on the conclusion that no constitutional violation occurred); *Groh v. Ramirez*, 540 U.S. 551, 563 (2004) ("Having concluded that a constitutional violation occurred, we turn to the question whether petitioner is entitled to qualified immunity despite that violation."); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (expressing "no view as to the correctness of the Court of Appeals' decision on the constitutional question" because, in any event, "the Court of Appeals was wrong on the issue of qualified immunity"); *see also id.* at 601 (Breyer, J., concurring) (noting that *Saucier* "requires lower courts to decide (1) the constitutional question prior to deciding (2) the qualified immunity question").

. . . is a matter on which the burden of proof is allocated to the defendants."); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) ("the good faith immunity of individual police officers is an affirmative defense to be proved by the defendant");[4] *cf. Dennis v. Sparks*, 449 U.S. 24, 29 (1980) (noting that in a § 1983 action "the burden is on the official claiming immunity to demonstrate his entitlement"); *but cf. Harlow*, 457 U.S. at 815 n.24 (explaining that the Court had not decided which party bears the burden of proof).[5]

---

[4]*But see Bryant*, 994 F.2d at 1086 ("Once the defendant raises a qualified immunity defense, the plaintiff carries the burden of showing that the defendant's alleged conduct violated the law and that such law was clearly established when the alleged violation occurred."); *Mitchell v. Rice*, 954 F.2d 187, 190 (4th Cir. 1992) ("We have previously held that the individual bringing suit against a public official bears the burden of clearly establishing the law allegedly violated."); *Clark v. Link*, 855 F.2d 156, 160-61 (4th Cir. 1988) (noting that "the burden of establishing that . . . the right violated was clearly established . . . appears to rest on the plaintiff"). Given the conflict in our caselaw on this point, we must follow the earliest of the conflicting opinions. *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court."). Regarding the burden of proof on qualified immunity, the earliest case appears to be *Logan*.

[5]Several circuit courts place the entire burden of proof in qualified immunity cases on the plaintiff. *See, e.g.*, *Breen v. Texas A&M Univ.*, 485 F.3d 325, 331 (5th Cir. 2007) ("When a defendant invokes qualified immunity . . . the burden shifts to the plaintiff to rebut the applicability of the defense."); *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) ("Once defendants satisfy their initial burden of demonstrating that they were acting within the scope of their authority, a plaintiff bears the burden of proving that defendants are not entitled to qualified immunity."); *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007) ("Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it."); *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007) ("Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct."); *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.2 (11th Cir. 2007) ("When it is undisputed . . . that government officials were acting within their discretionary authority, the burden is on the plaintiff to establish that qualified immunity is not appropriate.").

## II

With these principles in mind, we begin our *Saucier* analysis by considering the initial question of whether the facts, when viewed in Henry's favor, show that Purnell used excessive force in arresting him and, therefore, violated his Fourth Amendment right to be free from an unreasonable seizure. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). Purnell primarily argues that he is entitled to summary judgment because he did not "seize" Henry within the meaning of the Fourth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (noting that the "Fourth Amendment covers only 'searches and seizures'").

### A.

The first step in assessing whether Purnell violated Henry's Fourth Amendment right is to determine the relevant facts. *Scott v. Harris*, ___ U.S. ___, 127 S. Ct. 1769, 1774 (2007). Because the parties do not challenge the district court's basic statement of the underlying facts, which appear to be presented favorably for Henry, we adopt and set forth that statement:

"On October 9, 2003, an arrest warrant was issued for Henry for failing to obey a court order to either pay his child support arrearage or report to a detention center to serve a jail sentence for failure to pay. On October 20, Purnell went to Henry's last known address in Eden, Maryland, in an attempt to arrest him. The officer discovered Henry at that address but Henry avoided arrest by lying about his identity. Soon thereafter, Purnell learned that the man he had talked to was in fact Henry. Three days later, Purnell noticed Henry in a passing truck, followed him, and pulled into a driveway alongside the truck. Purnell ordered Henry out of the truck. Henry complied but fled before he could be handcuffed. Purnell claims Henry pushed him in the course of escaping; Henry denies that occurred. In any event, Purnell pulled out a Glock .40 caliber handgun and shot the fleeing Henry in the elbow. Henry stopped running and was arrested.

"The parties have stipulated that Purnell did not intend to shoot Henry with his handgun. Rather, he intended to unholster and discharge his Taser, a non-lethal device that immobilizes a suspect via an electro-muscular disruption. The Taser was holstered on Purnell's right side, just below his holstered handgun. Purnell has testified on deposition that he reached for the Taser because he felt endangered by Henry's actions. He asserts that he thought Henry might be running to get a weapon.

"Purnell did not realize he had fired the handgun until after the weapon discharged. He immediately told Henry and another witness at the scene that he had not meant to shoot Henry and that he had grabbed the wrong weapon." *Henry*, 428 F. Supp. 2d at 394-95.[6]

### B.

Having identified the relevant facts, we now turn to the question of whether these facts establish that Purnell seized Henry within the meaning of the Fourth Amendment. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, *through means intentionally applied*." *Brendlin v. California*, ___ U.S. ___, 127 S. Ct. 2400, 2405 (2007) (citations and internal punctuation omitted) (emphasis in original). Purnell unquestionably terminated Henry's freedom of movement by means of physical force when he shot him; however, he contends that because he intended to shoot Henry with the Taser, rather than the Glock, he did not terminate Henry's freedom of movement "through means intentionally applied."[7] The district court rejected this argument, as do we.

---

[6]At oral argument, Henry's counsel agreed that no more than 3-5 seconds elapsed between the time Purnell drew the Glock and fired it, and that the entire flight and chase lasted no more than 10 seconds.

[7]Although not included in the district court's order, the record establishes that before Henry fled, Purnell informed him that he was under arrest and grabbed his arm while attempting to handcuff him. *See* J.A. 150-57. Notwithstanding this fact, the parties and the district court considered the seizure to have occurred, if at all, only when Purnell shot

1.

In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the Court considered whether a complaint stated a Fourth Amendment claim based on allegations that police, by creating a roadblock to stop a vehicle involved in a high-speed chase, seized the driver of the vehicle when it crashed into the roadblock. The Court noted that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control," and although a "seizure occurs even when an unintended person or thing is the object of the detention or taking, . . . the detention or taking itself must be willful." 489 U.S. at 596. The Court explained:

> [I]f a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant - even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Id.* at 596-97 (emphasis in original).

The Court then observed that a roadblock "is designed to produce a stop by physical impact if voluntary compliance does not occur,"

---

Henry. On this limited review, we will do likewise, and we will not consider the unexplored question of whether Purnell seized Henry by grabbing his arm. *See, e.g.*, *Sibron v. New York*, 392 U.S. 40, 67 (1968) (holding that "[w]hen the policeman grabbed Peters by the collar, he abruptly 'seized' him and curtailed his freedom of movement").

and it rejected any inquiry into whether the police subjectively intended for the roadblock to cause the driver to stop on his own before crashing or whether the roadblock was designed to produce a collision. *Id.* at 598. In doing so, the Court cautioned against drawing too fine a line "[i]n determining whether the means that terminates the freedom of movement is the very means that the government intended," or else courts "will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg." *Id.* at 598-99. Applying these principles, the Court held:

> We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock — and that he was so stopped.

*Id.* at 599.[8]

---

[8]Finding that no seizure occurred, the court of appeals in *Brower* had analogized the case to a hypothetical situation in which a driver loses control of a vehicle and crashes while fleeing from police. 489 U.S. at 595. The Court disagreed with this analogy, explaining that no seizure would occur there because the "pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means - his loss of control of his vehicle and the subsequent crash." *Id.* at 597. However, the Court observed that if "the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." *Id.* The Court has since been presented with both scenarios. *See Scott*, 127 S. Ct. at 1776 (indicating that the police seized a fleeing suspect by ramming the suspect's bumper and causing him to crash); *Lewis*, 523 U.S. at 844 (holding that the police did not seize a fleeing suspect who accidentally crashed during a chase).

2.

We are not presented with a case where police stopped someone by mere happenstance, such as the passerby who is pinned when a police car slips its brake, or by the unintended consequences of an attempted seizure, such as the fleeing suspect who crashes his vehicle. Instead, the undisputed evidence in the record establishes that Purnell's specific intent was to stop Henry from fleeing by means of firing a weapon, and Henry was in fact stopped by the very instrumentality (*i.e.*, the Glock) that Purnell set in motion. We recognize that Purnell did not intend to use the Glock, but we are also mindful of the *Brower* Court's admonition that we should not draw too fine a line in determining whether the means that terminate a person's freedom of movement is the very means that an officer intended. If, as the Court noted, a seizure would occur when a person is stopped by the accidental discharge of a gun that an officer meant to use only as a club, then we believe that a seizure surely occurred here where Purnell intended to stop Henry by firing a weapon at him and succeeded in doing so.[9] Accordingly, we affirm the portion of the district court's order finding that Purnell seized Henry. *See* 428 F. Supp. 2d at 395-96.[10]

---

[9]Although we have not considered a case involving facts similar to those now before us, we have found Fourth Amendment seizures to have occurred in other factual situations where officers have made mistakes. *See, e.g.*, *Miller v. Prince George's County*, 475 F.3d 621, 629-30 (4th Cir. 2007) (seizure occurred where officers mistakenly detained the wrong person); *Mazuz v. Maryland*, 442 F.3d 217, 230 (4th Cir. 2006) (seizure occurred where officers executing a warrant mistakenly entered the wrong room and detained the occupants); *Milstead v. Kibler*, 243 F.3d 157, 164 (4th Cir. 2001) (seizure occurred where the officer deliberately shot an innocent victim, mistakenly believing him to be the suspect); *Vathekan v. Prince George's County*, 154 F.3d 173, 177-79 (4th Cir. 1998) (seizure occurred where the officer who was looking for a suspect released a police dog into a building and the dog attacked an innocent person).

[10]Because the "standards for analyzing claims of excessive force are the same under Articles 24 and 26 of the Maryland Constitution as that under the Fourth Amendment," *Hines v. French*, 852 A.2d 1047, 1069 (Md. App. 2004), Henry's state constitutional claim is "inextricably intertwined" with the district court's denial of qualified immunity on the § 1983 claim, *see Mazuz*, 442 F.3d at 231 n.9 (holding that Article 26 excessive force claim was inextricably intertwined with identical § 1983 claim). Therefore, we have jurisdiction to review the district court's order as it pertains to the state claim, and our holding that a Fourth Amendment seizure occurred leads to the conclusion that a seizure also occurred under state law.

C.

Our determination that Purnell seized Henry does not end the inquiry as to whether a Fourth Amendment violation occurred. Rather, we must next decide whether Purnell acted unreasonably because the "Fourth Amendment does not proscribe all state-initiated . . . seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). As noted, Henry contends that Purnell used excessive force while attempting to arrest him, thereby rendering the seizure unreasonable.

Typically, the level of force that a plaintiff claims to be excessive is the level of force that a law enforcement officer intentionally used (regardless, of course, of whether the officer intended the ultimate consequences). However, this case is atypical because Henry's claim is based on the fact that Purnell shot him with the Glock, which is *not* the level of force that Purnell intended; indeed, Henry has stipulated that Purnell intended to use the Taser and used the Glock only as the result of a mistake.[11] Although we have rejected Purnell's argument that the fact of his mistake establishes that he did not seize Henry, the fact of the mistake does bear on the question of whether the seizure was nonetheless reasonable because "a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment." *Milstead*, 243 F.3d at 165; *see also Maryland v. Garrison*, 480 U.S. 79, 87 (1987) (recognizing "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants"); *McLenagan v. Karnes*, 27 F.3d 1002, 1008 (4th Cir. 1994) (noting that § 1983 "does not purport to redress injuries resulting from reasonable mistakes"). In accord with this principle, mistakes made by officers during the course of their duties have been held to be reasonable for Fourth Amendment purposes in a variety of circumstances.

[11]Purnell does not argue that an intentional use of the Glock would have been reasonable; likewise, Henry does not argue that Purnell's decision to use the Taser was unreasonable. Thus, to the extent that it may be relevant in the qualified immunity analysis, the parties appear to agree that Purnell understood the constitutional restraints on his use of force in this circumstance.

*See, e.g.*, *Garrison*, (mistaken search of the wrong premises); *Hill v. California*, 401 U.S. 797 (1971) (mistaken arrest of the wrong person); *Mazuz* (mistaken search of the wrong premises); *Milstead* (mistaken fatal shooting of an innocent person).

1.

The district court concluded that Purnell was not entitled to summary judgment because of "the existence of disputed facts concerning the objective reasonableness of his belief that he was firing a Taser when he shot Henry with a handgun." 428 F. Supp. 2d at 398. Combining its Fourth Amendment and qualified immunity discussions, the district court explained:

> Purnell violated Henry's Fourth Amendment rights if . . . his belief he was using a Taser was objectively unreasonable under the circumstances he was confronting, as he then reasonably perceived them to be. Likewise, these rights were clearly established because under *Graham* it would have been clear to a reasonable officer that it was unlawful to use deadly force on the basis of an objectively unreasonable belief about the nature of the weapon being discharged.

*Id.* Although the district court noted that a jury ultimately might agree that Purnell's conduct was objectively reasonable,[12] it then identified various facts purportedly in dispute that it deemed relevant to the reasonableness of Purnell's actions:

> (1) the nature of the training Purnell had received to prevent incidents like this from happening, (2) whether he acted in accordance with that training, (3) whether he would have discovered that he was holding a handgun rather than a Taser if, as he apparently had been trained to do, he had attempted to flip the thumb safety device on what he thought

---

[12]We note that in *Scott*, the Court stated that at the summary judgment stage, once a court has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of an officer's actions "is a pure question of law." 127 S. Ct. at 1776 n.8.

was the Taser, (4) whether Henry's trickery in eluding him three days before heightened Purnell's sense of danger, warranting the need for hurried action, or (5) whether Henry's earlier trickery angered Purnell, causing him to act with undue haste and inconsistently with his training.

*Id.* The district court noted in conclusion that "[r]esolution of any disputes about these facts and the effect of the reasonable inferences to be drawn from them must await trial." *Id.*

### 2.

Before Purnell moved for summary judgment, Henry had filed a discovery motion seeking to compel Purnell to produce certain documents that were used by the Somerset County Sheriff's Office, including training materials relating to the Glock and Taser. Purnell objected to producing these documents on relevance grounds. On the day that Purnell filed his summary judgment motion, Henry requested that the district court rule promptly on the discovery motion, asserting that the discovery documents "may prove to be vital" to his summary judgment opposition. Although there was some additional activity involving the discovery motion — including Henry's request for relief under Rule 56(f) of the Federal Rules of Civil Procedure, which permits a court to deny summary judgment or order a continuance where the party opposing the motion sets forth by affidavit the reasons why that party is unable to present facts essential to justify its opposition — the district court did not rule on the motion until the same day that it denied the summary judgment motion. By separate order, the district court granted the discovery motion, noting: "As reflected in my opinion on defendant's summary judgment motion, I believe that training materials relating to the Taser are relevant to this litigation." J.A. 209. Purnell appealed the order granting this discovery motion, but we dismissed that portion of the appeal on Henry's motion.

### 3.

We have recounted this discovery matter because we believe that its outcome, combined with the district court's analysis, necessitates a remand of this case for further proceedings. As we have explained,

when a defendant properly asserts qualified immunity as a defense, the plaintiff bears the initial burden of establishing that the defendant violated his constitutional rights. Thus, in this summary judgment proceeding, Henry bore the initial burden of showing that the seizure was unreasonable. Without noting that Henry bore this burden of proof, the district court concluded that several disputed facts bear on the question of objective reasonableness, and it stated that the resolution of these disputed facts "must await trial." 428 F. Supp. 2d at 398. Most of these purported factual disputes appear to involve the training Purnell received concerning use of the Glock and Taser, which is the issue that was the subject of Henry's discovery request.

We believe that the upshot of all of this is that the district court must reassess the issue of whether a constitutional violation occurred in light of the proper burden of proof and the discovery materials that it ordered Purnell to produce, and it must do so before moving this case forward. *See Scott*, 127 S. Ct. at 1773 n.2 (noting that qualified immunity "'is effectively lost if a case is erroneously permitted to go to trial'" (*quoting Mitchell*, 472 U.S. at 526)). This course will ensure that Henry is afforded the opportunity to present all potentially relevant evidence, while also allowing Purnell the opportunity to have his qualified immunity defense decided before it is effectively lost.

III

Based on the foregoing, we affirm the district court's determination that a seizure occurred, and we remand this case to the district court for further proceedings consistent with this opinion. On remand, the district court should first determine whether Henry has met his burden of establishing that the seizure in this case was unreasonable (*i.e.*, that Purnell's mistake in using the Glock rather than the Taser was unreasonable). If the district court finds that Henry has met this burden, then Purnell will have the opportunity to demonstrate his entitlement to qualified immunity. Apart from our determination that a seizure occurred, we express no opinion on the ultimate merits of the case.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*