SHEDD, Circuit Judge,
dissenting:
Deputy Purnell, an experienced law enforcement officer, attempted to arrest *543 Henry pursuant to a lawful warrant. Before the deputy could search Henry for weapons, Henry fled toward his residence. The parties have stipulated that during the ensuing foot chase, Deputy Purnell “intended to unholster and discharge his Taser M26” but, instead, “unholstered and fired his service weapon, believing that it was his Taser M26.” J.A. 30. Deputy Purnell unfortunately shot Henry with his firearm as a result of this mistake.
The dispositive question in this case is not whether it was reasonable for Deputy Purnell to use deadly force to stop Henry or even whether it was reasonable for the deputy to attempt to use his Taser. Rather, the question is whether the deputy’s mistake in drawing and firing his Glock while in hot pursuit of Henry was constitutionally reasonable. See Henry v. Purnell, 501 F.3d 374 (4th Cir.2007) (“Henry I”).[1] When properly viewed in light of controlling precedent, which counsels that we must «view the facts of this potentially dangerous arrest without engaging in hindsight second-guessing, the undisputed material evidence clearly establishes that the deputy’s mistake is constitutionally reasonable. Accordingly, Henry has failed as a matter of law to meet his burden of establishing a Fourth Amendment violation, and the district court properly granted summary judgment in favor of Deputy Purnell on Henry’s federal and state-law claims on that basis.[2]
I
For our purposes, the material facts are undisputed.[3] On October 23, 2003, Deputy Purnell attempted to arrest Henry pursuant to a lawful warrant. The warrant charged Henry with second degree escape based on his failure to comply with a court order to report to the county detention center for service of a 47-day sentence.[4]
*544 The attempted arrest occurred in Henry’s driveway, where Henry was one of three people in a parked truck. Deputy Purnell, who was alone, approached the vehicle, and Henry eventually acknowledged his identity. After Deputy Purnell advised Henry that he had a warrant for his arrest, Henry exited the vehicle. The driver of the vehicle and the other passenger remained inside.
Henry initially appeared cooperative after exiting the vehicle, but he fled toward his trailer before Deputy Purnell could arrest him. At that time, Deputy Purnell did not know whether Henry was armed or whether he was fleeing in an attempt to arm himself. As Deputy Purnell explained:
Q: And what danger did you feel that you were in?
A: Because [Henry] was in his neighborhood, he could have gone anywhere, gotten anything, could have run to the back, gotten a shovel, gone back in the house, gotten a gun. Anything. Besides that, I didn’t know if he had anything on him. I never had an opportunity to search him.
Q: At that point ... did you consider him a dangerous or violent subject?
A: Yes.
Q: And did you perceive him as a threat as he continued to run?
A: Yes, sir.
Q: Because he may have gotten a weapon; is that correct?
A: That’s correct, sir.
Q: And during this entire time that he was running, your opinion did not change — ?
A: That’s correct.
J.A. 258-61.
After Henry fled, Deputy Purnell began a chase that lasted 3-5 seconds. While he was running, Deputy Purnell kept his eyes focused on the fleeing Henry, and he reached for his Taser, which was holstered on his right side below his dock. However, Deputy Purnell mistakenly drew his dock rather than his Taser. Because he was running and focused on Henry, Deputy Purnell did not realize that he had mistakenly unholstered the dock. As Henry continued to flee, Deputy Purnell— believing that he was holding the Taser— shot Henry in the arm. Henry then began to slow down, and Deputy Purnell quickly overtook him.[5]
Deputy Purnell immediately recognized his mistake, and he told Henry that he had not intended to shoot him. He then escorted Henry back to the truck and radioed for medical assistance. Deputy Purnell rendered first-aid to Henry, and he permitted Henry’s companions to exit the truck and assist him. During this time, he reiterated that he had grabbed the dock by mistake and never intended to shoot Henry. Deputy Purnell remained with Henry until other law enforcement units arrived and relieved him.
At the time of this incident, Deputy Purnell had been employed with the Somerset County Sheriffs Office for approximately one year. Before that, he spent 25 years as an officer with the Maryland Nat *545 ural Resources Police. Deputy Purnell had only been carrying the Taser for a few months before this incident, and he had never previously deployed it in the field. Indeed, he had only used it one time in a training exercise. Likewise, he had only been carrying the Glock for a relatively short time, and he had never fired it in the field. He carried the Taser and Glock on the same side of his body (his dominant side) in a holster because he had been instructed to do so. Although there are differences between the two weapons, such as their weight and the manner in which they function, the Taser and the Glock appear to be remarkably similar in shape. See J.A. 288-89.
Approximately two months before the shooting, the Somerset County Sheriff issued Special Order 03-04, regarding Taser usage. Among other things, that order explains that the Taser could be used “to control a dangerous or violent subject when deadly force is not justified and attempts to control the subject by other tactics have been ineffective,” and “to safely effect an arrest.” J.A. 285. It also instructs that “[wjhen practical” officers should use verbal commands and point the laser sight at the subject before discharging it. J.A. 286.[6]
II
“It goes without saying that the Fourth Amendment bars only unreasonable searches and seizures.” Maryland v. Buie, 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The purpose of the Fourth Amendment is “to protect the people of the United States against arbitrary action by then’ own Government,” United States v. Verdugo-Urquidez, 494 U.S. 259, 266, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), and it “addresses ‘misuse of power,’ not the accidental effects of otherwise lawful government conduct,” Brower v. County of Inyo, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (citation omitted). Section 1983 (42 U.S.C.) allows a plaintiff “to seek money damages from government officials who have violated his Fourth Amendment rights,” Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), but it “does not purport to redress injuries resulting from reasonable mistakes,” McLenagan v. Karnes, 27 F.3d 1002, 1008 (4th Cir.1994).[7]
A.
Arrest is, of course, a form of seizure, and “the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In considering whether an officer acted reasonably in making an arrest, we must bear in mind that “American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.” Terry v. Ohio, 392 U.S. 1, 23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Thus, “[t]he public interest ... includes the substantial public concern for the safety of police officers lawfully carrying out the law enforcement effort.” United States v. Sakyi, 160 F.3d 164, 167 (4th Cir.1998).
*546 A “custodial arrest is fluid and ‘[the] danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty.’ ” Thornton v. United States, 541 U.S. 615, 621, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (citation omitted) (emphasis in original). Because “[t]here is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger,” “[ejvery arrest must be presumed to present a risk of danger to the arresting officer.” Washington v. Chrisman, 455 U.S. 1, 7, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982) (emphasis added). The risk to the officer is heightened when an arrestee flees, as “[t]he act of resisting arrest poses a threat of direct confrontation between a police officer and the subject of the arrest, creating the potential for serious physical injury to the officer and others.” United States v. Wardrick, 350 F.3d 446, 455 (4th Cir.2003).
B.
“What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.” United States v. Montoya De Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). “Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case.” Scott v. United States, 436 U.S. 128, 139, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). “[T]he Fourth Amendment’s commands, like all constitutional requirements, are practical and not abstract,” United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), and “[w]e are to approach the Fourth Amendment ... with at least some measure of pragmatism” and to avoid “pressing inflexible rules,” Mora v. City of Gaithersburg, MD, 519 F.3d 216, 222 (4th Cir.2008).
“A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.” United States v. Sharpe, 470 U.S. 675, 686-87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). However, reasonableness for purposes of the Fourth Amendment “is evaluated from the perspective of the officer on the scene, not through the more leisurely lens of hindsight.” Abney, 493 F.3d at 416; see also Waterman v. Batton, 393 F.3d 471, 477 (4th Cir.2005) (noting that “reasonableness is determined based on the information possessed by the officer at the moment that force is employed”). As Judge Wilkinson of this Court recently noted: “It’s always tempting to go the could-have/ should-have route in hindsight, but that is not how the Supreme Court has structured the objective reasonableness inquiry.” Hunsberger v. Wood, 583 F.3d 219, 222 (4th Cir.2009) (Wilkinson, J., concurring in denial of rehearing en banc). For this reason, courts should not “second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken.... ” McLenagan, 27 F.3d at 1007-08.
The Fourth Amendment “does not require omniscience,” and officers “ ‘need not be absolutely sure ... of the nature of the threat or the suspect’s intent to cause them harm’ ” before using force. Anderson v. Russell, 247 F.3d 125, 132 (4th Cir.2001) (quoting Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir.1996)). Moreover, “[ojfficers are not required to use the least intrusive means available; they simply must act within the range of reasonable conduct.” Brooks v. City of Seattle, 599 F.3d 1018, 1025 (9th Cir.2010); see also Board of Ed. of Ind. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 837, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (noting that “this Court has repeatedly stated that reasonableness under *547 the Fourth Amendment does not require employing the least intrusive means, because ‘[t]he logic of such elaborate less-restrictive alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.’ ” (citation omitted)).
Importantly, reasonableness “does not, by definition, entail perfection,” United States v. Phillips, 588 F.3d 218, 227 (4th Cir.2009), and courts must “allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests,” Maryland v. Garrison, 480 U.S. 79, 87, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Elaborating on this point, the Supreme Court has stated: “Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.” Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Accordingly, “a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment.” Milstead v. Kibler, 243 F.3d 157, 165 (4th Cir.2001). Nearly two decades ago, our en banc Court recognized the chilling effect that a contrary rule would have on law enforcement: “If every mistaken seizure were to subject police officers to personal liability under § 1983, those same officers would come to realize that the safe and cautious course was always to take no action.” Gooden v. Howard County, Md., 954 F.2d 960, 967 (4th Cir.1992) (en banc)-, see also Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir.1991) (“If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost.”).
Both the Supreme Court and this Court have repeatedly found that reasonable mistakes made by law enforcement officers did not constitute Fourth Amendment violations. For example, in Garrison, Mazuz v. Maryland, 442 F.3d 217 (4th Cir.2006), and United States v. Patterson, 278 F.3d 315 (4th Cir.2002), the officers’ mistaken searches of the wrong premises were found to be constitutionally reasonable. Similarly, in Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the officers’ mistaken belief that they had third-party consent to enter and search a premises was found to be constitutionally reasonable. Likewise, in Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the Court found a mistaken arrest of the wrong person to be reasonable under the Fourth Amendment.
Our decision in Milstead is particularly instructive. There, the police officer had intended to shoot a fleeing criminal suspect, but he mistakenly shot and killed an innocent person. We held that the officer’s seizure of the innocent person did not violate the Fourth Amendment because the officer’s mistake was reasonable. See also Culosi v. Bullock, 596 F.3d 195, 201 (4th Cir.2010) (“A mistaken use of deadly force ... is not necessarily a constitutional violation under the Fourth Amendment.”).
None of these cases involves the precise factual situation present here, “but, as in all Fourth Amendment cases, we are obliged to look to all the facts and circumstances of this case in light of the principles set forth” in prior precedent. South Dakota v. Opperman, 428 U.S. 364, 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). These cases instruct that where, as here, an officer has made a mistake during a search or seizure, we must consider the facts and circumstances as the officer perceived them and then apply an objective standard over those facts to determine whether the officer’s mistake was reasonable. In doing so, we must avoid the temptation to sec *548 ond-guess the officer’s actions, especially in a case involving an exigency such as hot pursuit.
C.
Henry bears the burden of proof on the issue of whether a constitutional violation occurred. Henry I, 501 F.3d at 377. We review an award of summary judgment de novo, applying the same familiar Rule 56 standards applicable in the district court. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir.2006) (en banc). Summary judgment is appropriate if “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). For purposes of summary judgment consideration, the substantive law identifies which facts are material, and “[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In Scott v. Harris, 550 U.S. 372, 381 n. 8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Supreme Court instructed that at the summary judgment stage, once a court has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of an officer’s actions for Fourth Amendment purposes “is a pure question of law” to be decided by the court rather than the jury. In my view, the district court properly analyzed this case and reached the correct result.
What I stated above bears repeating: the Fourth Amendment does not address the accidental effects of otherwise lawful government conduct, and § 1983 does not purport to redress injuries resulting from reasonable mistakes. The undisputed material facts establish as a matter of law that Deputy Purnell in no way intentionally “misused” the power of his office. Rather, he was lawfully attempting to arrest Henry, which in itself is a potentially dangerous encounter, and Henry heightr ened the danger by his decision to flee. Properly recognizing the limitation on the use of deadly force, Deputy Purnell attempted to use the Taser to stop Henry.[8] In the rapidly evolving situation, Deputy *549 Purnell mistakenly drew the Glock and fired it.
Again, the Supreme Court has instructed that we must “allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests.” Garrison, 480 U.S. at 87, 107 S.Ct. 1013. Deputy Purnell’s mistake is indeed unfortunate, but it was nonetheless one that was made in the tense and potentially dangerous circumstances arising from Henry’s flight from arrest. Henry has failed to present any material evidence to demonstrate that this mistake was anything other than an honest one.[9] Therefore, the mistake is reasonable within the meaning of the Fourth Amendment as a matter of law. For this reason, Deputy Purnell did not violate Henry’s Fourth Amendment right to be free from an unreasonable seizure, and summary judgment in the deputy’s favor is appropriate. See, e.g., Russell, 247 F.3d at 130 (“Given the uncontroverted evidence as to what Russell perceived immediately before firing, we do not believe that there is a legally sufficient evidentiary basis for a rational jury to find for Anderson on the issue of excessive force. Accordingly, we hold that Russell was entitled to judgment as a matter of law on the excessive force claim.” (emphasis added)).[10]
*550 D.
The majority concludes otherwise, holding that the question of whether Henry has established a Fourth Amendment violation is for a jury. In doing so, the majority equates Deputy Purnell’s conduct with that of a rogue officer who intentionally shoots at an unarmed misdemeanant. See Majority Op., at 531-32 (“The objective circumstances of this case are that Purnell shot a fleeing suspected misdemeanant whom he had no reason to believe was a threat.”). I believe the majority erroneously reaches this conclusion by improperly viewing this case through the lens of hindsight to minimize not only the inherent danger involved in every arrest, but also the specific danger in this case that stemmed from Henry’s decision to flee before being searched.
For example, the majority repeatedly emphasizes that the arrest warrant was for a relatively minor crime. See, e.g., Majority Op., at 527, 531-32. However, the danger faced by an officer making a custodial arrest flows from the fact of the arrest itself and “not from the grounds for arrest.” United States v. Robinson, 414 U.S. 218, 234 n. 5, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Moreover, as we explained in Russell, even if the suspected criminal activity is relatively minor, “that factor would prove irrelevant to our excessive force analysis because our focus is on the circumstances as they existed at the moment force was used.” 247 F.3d at 132.[11]
The majority further states that “critically, this case presents nothing to suggest Henry posed any threat whatsoever — no menacing conduct and no violent criminal history.” Majority Op., at 532. This assertion incorrectly focuses on Henry, the arrestee, and ignores the Supreme Court’s admonition concerning the potential danger that flows from the fact of the arrest itself, as well as our admonition that an act of resistance increases the danger to both an officer and bystanders. Without question, a suspect’s known dangerousness can heighten the potential danger of an arrest, but the fact that a suspect may not appear at first glance to be dangerous does not necessarily negate the inherent danger of the arrest.
In any event, the majority’s assertion ignores the specific, undisputed fact that at the time Henry fled, Deputy Purnell had no way of knowing if he was dangerous because, among other reasons, he had not yet searched him. See Knowles v. Iowa, 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (noting that “the authority to conduct a full field search as incident to an arrest [is] a ‘bright-line rule,’ which [is] based on the concern for officer safety”). Moreover, Henry’s flight, which allowed him to evade the search incident to the arrest certainly was sufficient to cause the deputy, like any reasonable officer, to suspect that Henry, like any other suspect in similar circumstances, may have been concealing something on his person. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (“Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of *551 such.”). Incredibly, the majority discounts any potential danger arising from the arrest and Henry’s flight because Deputy Purnell knew such mundane facts as where Henry lived, who his wife and former employer are, and that he had some vague intention of posting bail after he was arrested. See Majority Op., at 531-32. Surely, the majority must concede that facts of this nature could be present in cases involving even the most dangerous of individuals.[12]
Simply put, under the majority’s view of the facts, Henry presented no danger at all to Deputy Purnell. Of course, this raises the question of what the majority would have had the deputy do in this situation. It is not enough merely to declare that he should have been more careful. Rather, the context of this incident matters, and the objective reasonableness test must factor in that context. If, as the majority believes, this was not a dangerous situation, could the deputy have used the Taser at all? Should the deputy have been required to forego use of the Taser and, instead, to chase Henry with the hope of catching up to him and subduing him by physical force, an act that would have subjected both men to the risk of significant injury (and a possible excessive force claim against Deputy Purnell), or should he have simply let Henry run away, taking solace in the fact that he knew who his wife is and where he lived? As I noted earlier, the Fourth Amendment does not require a law enforcement officer to resort to these lesser alternatives.
In addition to erroneously minimizing the potentially dangerous nature of this arrest, the majority also errs by engaging in inappropriate second-guessing. See, e.g., Majority Op., at 532-33. Perhaps the most telling example of this is contained in the following passage:
As he pursued Henry in an attempt to arrest him for a fairly minor, non-violent crime, Henry had his back to Purnell and was not threatening him or anyone else in any way. There was no evidence indicating that Purnell did not have the split-second he would have needed to at least glance at the weapon he was holding to verify that it was indeed his Taser and not his Glock.
Majority Op., at 533. Of course, we now know that Henry — who “had his back to Purnell” — was not armed. However, Deputy Purnell did not have the luxury of that knowledge in the rapidly evolving situation, and he did what officers are trained to do: he focused on the fleeing suspect, who could have turned with a weapon at any moment, in order to protect himself and any innocent bystanders. The majority’s belief that the deputy should have taken a “split-second” to focus his attention away from Henry might be fine in a perfect world, but in the real world it is those split-seconds during which law enforcement officers (and bystanders) are wounded or killed.[13]
*552 III
In closing, I cannot help but reflect upon the peculiar result created by the majority’s decision when compared to our prior precedent. In Robles v. Prince George’s County, Md., 302 F.3d 262, 271 (4th Cir.2002), we held that police officers who tied an arrestee to a metal pole in a deserted parking lot and left him there in the middle of the night were immune from federal constitutional liability even though they “should have known, and indeed did know, that they were acting inappropriately.” We did so while noting that their conduct was a “type of Keystone Kop activity that degrades those subject to detention and that lacks any conceivable law enforcement purpose.” Id.
The same certainly cannot be said about Deputy Purnell’s conduct. Instead of doing something that he knew was inappropriate, Deputy Purnell attempted to do the right thing under the rapidly evolving and potentially dangerous circumstances he was in. However, because he made a mistake in his execution of an otherwise proper action, he (unlike the “Keystone Kops” in Robles) is potentially personally liable for monetary damages under § 1983. This does not accord with the practical construction which must be given to the Fourth Amendment.[14] Cf. Gooden, 954 F.2d at 967 (“It is a misguided application of § 1983 to expose to liability those who by all objective indicia were only trying to help.”). As we recently stated in Melgar v. Greene, 593 F.3d 348, 361 (4th Cir.2010), “undisputed good intentions should not be used to make an officer a more inviting target for monetary damages.” (emphasis in original). Yet, compared to Robles, that is exactly the result reached by the majority today.
In deciding this case as they do, my colleagues in the majority perhaps take comfort in the fact that the outcome of Deputy Purnell’s mistake is rather extreme (although certainly much less extreme than the fatal mistake in Milstead) and that a jury may in any event ultimately find in his favor.[15] Nonetheless, I believe that law enforcement officers should *553 pay close attention to how today’s opinion appears to change the law in this circuit. Henceforth, law enforcement officers are on notice that apparently (1) this Court does not share the Supreme Court’s view that arrests are presumptively dangerous; (2) this Court is prepared in a given case, including one involving hot pursuit, to substitute its judgment for the difficult and dangerous circumstances they face on the streets and to second-guess their actions literally on a second-by-second basis; and (3) when an officer has made an honest mistake in the otherwise proper execution of his duties, this Court is content to equate that mistake with intentional misconduct of the worst sort and to permit a jury to do the same. For these reasons, I believe that the decision today represents a significant departure from the precedent of this Court and the Supreme Court. Only time will tell whether this decision has the chilling effect that this Court, sitting en banc, warned about almost 20 years ago: that is, prompting law enforcement officers to choose inaction in order to avoid risking personal liability. See Gooden, 954 F.2d at 967.
Based on the foregoing, I respectfully dissent.
Judge Niemeyer and Judge Agee have authorized me to indicate that they join in this opinion.

. In Henry I, we noted: “Purnell does not argue that an intentional use of the Glock would have heen reasonable; likewise, Henry does not argue that Purnell’s decision to use the Taser was unreasonable.” 501 F.3d at 382 n. 11. Further, we remanded the case for the district court to determine in the first instance whether Hemy had met his burden of establishing that Purnell's mistake in using the Glock rather than the Taser was unreasonable. Id. at 384.

. There are, of course, two separate issues in a case such as this, where an officer asserts qualified immunity: (1) whether the plaintiff has established that the defendant violated a constitutional right and (2) if so, whether the defendant is entitled to qualified immunity. See Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Although the majority states that I am somehow "avoiding” the issue of qualified immunity, see Majority Op., at 533-34 n. 14, my view that Henry has failed to establish a Fourth Amendment violation renders it unnecessary for me to address qualified immunity. Thus, what the majority views as my “avoidance” of the issue is, in fact, entirely proper. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (“If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.”).

. The only potentially material fact that is in dispute is whether Henry pushed Deputy Purnell when he began to flee. For purposes of my conclusion that Deputy Purnell did not violate the Fourth Amendment, I accept Henry's version that he did not push the deputy, and this factual issue is therefore immaterial. Of course, if this issue is ultimately resolved in Deputy Purnell's o favor, it would further underscore the reasonableness of his actions.

. Under Maryland law, an individual who knowingly fails to obey a court order to report to a place of confinement is guilty of the misdemeanor crime of second degree escape and is subject to a term of imprisonment not exceeding 3 years or a fine not exceeding $5,000, or both. Md.Code Ann., Crim. Law, § 9-405. A state judge had ordered Henry to report to the Somerset County Detention Center on September 8, 2003, to serve a term of 47 days, but also provided him with an oppor *544 tunity to avoid having to serve the sentence by complying with certain requirements. Henry neither complied with those requirements nor reported to serve his sentence.

. Because Deputy Purnell was attempting to lawfully arrest Henry, and Henry has stipulated that Deputy Purnell mistakenly used his firearm, the fact that Deputy Purnell may have been annoyed at Henry for "pulling a whammy” on him (see Majority Op., at 527) on an earlier date is immaterial.

. I note this order merely for background purposes, and I do not contend that Deputy Purnell’s compliance with it is pertinent to the Fourth Amendment analysis. See Abney v. Coe, 493 F.3d 412, 419 (4th Cir.2007) ("It is ... settled law that a violation of departmental policy does not equate with constitutional unreasonableness.").

. The standard for liability on Henry’s federal and state-law claims is the same. See Henry I, 501 F.3d at 382 n. 10.

. As noted, "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. Henry does not claim that Deputy Purnell’s decision to use the Taser was unreasonable. See Henry I, 501 F.3d at 382 n. 11. Therefore, we need not decide that issue. Nonetheless, I believe that a recent case from the Eighth Circuit is instructive on this issue.
In McKenney v. Harrison, 635 F.3d 354 (8th Cir.2011), the police used a Taser while attempting to stop a misdemeanant suspect from fleeing from arrest. Upon being hit by the Taser, the suspect fell out of a second-story window to his death. In support of the suspect’s § 1983 lawsuit, which was predicated on the Fourth Amendment, the administrator of the suspect’s estate argued that the Taser use was excessive because the arrest warrants were based on minor offenses, the suspect never threatened the officers, the officers had no reason to believe that the suspect had a weapon, and the result of the force was the suspect’s death. The administrator also argued that a rational jury could have found that the officer failed to follow police department procedures by (among other things) not calling out "Taser” before deploying it. 635 F.3d at 359-60.
Properly recognizing that the reasonableness of the officer's actions must not be judged in hindsight, the Eighth Circuit affirmed the entry of summary judgment in favor of the officers. In reaching this conclusion, the court held that the officers could have reasonably interpreted the suspect's sudden movement toward the window during the arrest as an attempt to evade arrest, and they were thus entitled to use force to prevent the suspect's escape. The court noted that “[a]l-though the charges were limited to misdemeanors, the officers executing the warrant were not required to let [the suspect] run free.” Id. at 360. The court further held that *549 despite the fact that the suspect died, the use of the Taser was not excessive. The court pointed out that the officer "was required to react in a split second as [the suspect] sought to escape through a window only six to eight feet away,” and "[t]he alternative of attempting to subdue [the suspect] by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest.” Id.
McKenney is not binding precedent for this Court. However, it certainly suggests that Deputy Purnell acted reasonably in making the decision to use the Taser. Even before the day in question, Henry had demonstrated his intent to avoid apprehension, and his flight from arrest simply confirmed that intent. Like the officers in McKenney, had Deputy Purnell decided against using the Taser, his options were either to (1) stop chasing Henry and allow him to get away or (2) chase Henry and risk having to engage him in a physical encounter (assuming he could even catch him). Of course, under either option, Deputy Purnell faced the prospect that Henry was either armed or could arm himself during his flight. Unquestionably, the Fourth Amendment did not require Deputy Purnell to pursue either of these courses of action.

. The majority chides Deputy Purnell for arguing that he is entitled to summary judgment because he made an "honest mistake,” noting that it is "not the honesty of Purnell's intentions that determines the constitutionality of his conduct.” See Majority Op., at 532. Of course, "honest mistake” is a term of common parlance denoting an act that is done unintentionally and without malice. The "honest mistake” standard relied upon by Deputy Purnell comes directly from Supreme Court precedent, and it obviously refers to an objectively reasonable mistake. However, in assessing the objective reasonableness of the mistake, we must consider the officer's subjective intention in order to understand that he in fact made a mistake. See, e.g., Hill, 401 U.S. at 803-04, 91 S.Ct. 1106 ("The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.”).

. The majority asserts that my analysis "implies that all fleeing suspects may be apprehended through the use of deadly force.” See Majority Op., at 532 n. 9. Either the majority misunderstands or is indifferent to the controlling law, the material facts, or my opinion. To be clear, when analyzed properly, this case is not about the reasonableness of Deputy Purnell’s use of deadly force. It is about the reasonableness of his stipulated mistake in attempting to use what he believed to be a Taser. My analysis does not even address, much less justify, the intentional use of deadly force, which even Henry agrees is not present.

. Even the most seemingly minor arrest can lead to tragic consequences for law enforcement officers. See, e.g., State v. Bryant, 372 S.C. 305, 642 S.E.2d 582, 585 (2007) (“In June 2000, Cpl. Dennis Lyden ... was placing Bryant under arrest for driving with a suspended license when Bryant suddenly turned and wrestled Cpl. Lyden to the ground. During the course of the struggle, Bryant managed to obtain Cpl. Lyden’s flashlight and pistol magazine from the officer's duty belt and used them to severely beat Cpl. Lyden about the head. After beating the officer unconscious, Bryant took Cpl. Lyden's pistol from his holster and shot him in the head at close range.'' (emphasis added)).

. Henry was running in the direction of his trailer. Had he entered the trailer before Deputy Purnell was able to catch him, the deputy would have been entitled to follow him inside to apprehend him. See United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). Of course, the potential danger to the deputy would have been magnified in that instance. See Buie, 494 U.S. at 333, 110 S.Ct. 1093 ("The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.... [U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.”).

. Most states, including Maryland, have waived sovereign immunity and permit some claims for injury from the negligent acts of stale employees. A polential right to recover for such negligence, however, has no bearing on the entirely separate issue of whether a *552 federal constitutional claim against the officer is cognizable under § 1983. As we have explained, "allegations of a defendant's negligence do not state constitutional claims against such a defendant.” Covenant Media of SC, LLC v. City of N. Charleston, 493 F.3d 421, 436 (4th Cir.2007) (citation and punctuation omitted); see also Dow Chem. Co. v. United States, 476 U.S. 227, 232, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) ("State tort law does not define the limits of the Fourth Amendment.”).
Moreover, even if Deputy Purnell was insufficiently trained to use the Taser, it is difficult to discern how his potential personal liability for a constitutional violation hinges on whether his superiors adequately trained him. Cf. City of Canton, OH v. Harris, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (noting that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable”). To the extent that the training issue has been involved in this case, it arose during proceedings in the district court, and we did not endorse its relevance in Henry I. See 501 F.3d at 383 (quoting district court orders regarding training); 501 F.3d at 384 ("Apart from our determination that a seizure occurred, we express no opinion on the ultimate merits of the case.”).

. I recognize that in Robles we held that the officers violated the plaintiff’s constitutional rights and granted them qualified immunity. Although in my view we need not decide the issue of qualified immunity in this case, the result in Robles illustrates the odd result reached today by the majority.

. The majority correctly cites Scott for the proposition that once we view the facts in the light most favorable to Henry, the reasonableness of Deputy Purnell’s conduct is a pure question of law. See Majority Op., at 531-32. However, instead of applying this principle, the majority remands the issue for a jury to make that decision.